J-A07044-21

2021 PA Super 85

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MARK ANDREW DELMONICO | : | |
| | : | |
| Appellant | : | No. 1080 MDA 2020 |

Appeal from the Judgment of Sentence Entered July 23, 2020
In the Court of Common Pleas of Berks County Criminal Division at
No(s): CP-06-CR-0003573-2019

BEFORE:   BOWES, J., DUBOW, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                    **FILED MAY 04, 2021**

Appellant, Mark Andrew Delmonico, appeals from the judgment of sentence entered in the Court of Common Pleas of Berks County following his conviction by a jury on the charges of delivery of a controlled substance, possession with the intent to deliver a controlled substance, possession of a controlled substance, possession of drug paraphernalia, and criminal conspiracy.[1] Appellant contends the jury's verdict is against the weight of the evidence, and the trial court erred in requiring the prospective jurors to wear masks and socially distance during *voir dire*.

---

[*] Former Justice specially assigned to the Superior Court.

[1] 35 P.S. §§ 780-113(a)(30), (30), (16), (32), and 18 Pa.C.S.A. § 903, respectively.

After a careful review, we find no merit to Appellant's weight of the evidence claim. Further, we find the masking and social distancing of the prospective jurors did not interfere with the sole purpose of *voir dire*: the "empaneling of a competent, fair, impartial, and unprejudiced jury capable of following the instructions of the trial court." **Commonwealth v. Knight**, ___ Pa. ___, 241 A.3d 620, 640 (2020) (quotation omitted). Accordingly, we affirm.

The trial court has set forth the relevant facts and procedural history as follows:

> Appellant was charged [with various drug and conspiracy offenses]. Appellant filed an omnibus pretrial motion on October 16, 2019, which was thereafter denied. The case was thereafter scheduled for trial during the trial term beginning [on] March 11, 2020. Due to circumstances surrounding the health restrictions and public safety orders, the matter was continued for trail [*sic*] during the trial term beginning on July 1, 2020. On June 25, 2020, Appellant filed a Habeas Corpus/Motion to Review Motion to Dismiss. The motion was denied on June 27, 2020. The matter proceeded to trial on July 8, 2020.
>
> On the day of the trial, prior to *voir dire*, Defense Counsel placed on the record her objection to the potential jurors wearing masks because she was "concerned about [her] ability to be able to gauge the jury's reaction to certain things." Notes of Testimony of July 8-9, 2020, Jury Trial "Trial N.T.", at 3. Th[e] [trial] court overruled Defense Counsel's objection. **Id.** at 4.
>
> At trial, the Commonwealth first called Christopher Zukowsky ("Trooper Zukowsky"), a thirteen-year veteran with the PSP assigned to the Drug Law Enforcement Division Northeast Strike Force of the Bureau of Criminal Investigation ("Northeast Strike Force").[6] **Id.** at 71. Trooper Zukowsky testified that, on July 17, 2018, the C.I.[7] met with Trooper Zukowsky and other officers

---

6 Trooper Zukowsky described the Northeast Strike Force as essentially an undercover unit similar to a vice unit operating across twelve counties in the northeast that investigates strictly drug and firearm

crimes. [*Id.* at] 71-72. Trooper Zukowsky further testified that while Berks County is within the area assigned to the Southeast Strike Force based out of Norristown and Philadelphia, it is not unusual for the Northeast Strike Force Team to perform operations in Berks County or to assist the Southeast Strike Team therein. [*Id.* at] 72.

7 Trooper Zukowsky testified that the C.I. was an individual facing charges in Lehigh County, who expressed an interest in cooperating with law enforcement regarding his supplier. [*Id.* at] 74-75.

of the Northeast Strike Force at a prearranged location in Hamburg, Berks County, during which the officers searched the C.I.'s person and vehicle to ensure that the C.I. was not in possession of any contraband, including illegal drugs, firearms, or uncontrolled currency, of which none were found. [*Id.* at] 73-74, 81-82.

The C.I. indicated that he would be purchasing methamphetamine from an individual named West, but the C.I. understood that West was being supplied through a larger scale dealer. *Id.* at 83. The troopers then provided the C.I. with $1,000 in recorded currency [for] the controlled buy. *Id.* The C.I. then drove his vehicle to West's residence while troopers maintained surveillance on the vehicle. *Id.* at 84. Once at West's residence, the C.I. learned that West did not possess any methamphetamine and West relayed to the C.I. that they needed to go pick the drugs up. *Id.* at 85.

The C.I., West, and West's girlfriend, Wyatt, then traveled in the C.I.'s vehicle to Appellant's residence at [****] Eisenhauer Boulevard, whereupon West exit[ed] the vehicle and enter[ed] Appellant's residence. *Id.* The C.I. and Wyatt then proceed[ed] to a nearby Turkey Hill gas station. *Id.* at 86. Shortly thereafter, a white Ford F-250 pickup truck operated by Appellant with West as a passenger arrive[d] at the Turkey Hill. *Id.* at 87. West and Appellant briefly entered the Turkey Hill store, and upon reemerging, Appellant approached the passenger-side window of the C.I.'s vehicle. *Id.* at 88. At the request of West and Wyatt, the C.I. stopped at a restaurant and both West and Wyatt exited the vehicle. *Id.* The C.I. then returned to the prearranged meeting location in Hamburg, where he voluntarily relinquished a clear plastic bag containing approximately one ounce of methamphetamine. *Id.* at 88-89. The C.I. and his vehicle were again searched and no other contraband was found, nor was any portion of the $1,000 previously provided to the C.I. found. *Id.* at 89-90. Trooper Zukowsky confirmed that surveillance of the C.I. was maintained throughout the events described and there

appeared no opportunity for the C.I. to obtain the recovered drugs other than through the controlled buy. *Id.* at 90.

Trooper Zukowsky then testified that, on July 23, 2018, he again met with the C.I. at the prearranged location in Hamburg. *Id.* at 91. The C.I. and his vehicle were searched, during which no contraband, currency, or weapons were found, and he was provided with $1,000 in recorded currency to conduct a controlled buy of methamphetamine. *Id.* at 93. The C.I. traveled under surveillance to West's residence where he picked up West and a small dog, and [he] proceeded to Appellant's residence. *Id.* While Trooper Zukowsky did not personally observe what occurred at Appellant's residence, he testified that the C.I. returned to the prearranged location and relinquished another ounce of methamphetamine, which was wrapped in a yellow and white money wrapper. *Id.* at 94.

On cross-examination, Trooper Zukowsky explained that the C.I. and West met through their job as landscapers and West was identified as an individual with access to a source for illegal narcotics. *Id.* at 107. Furthermore, while the controlled buys were occurring, West had no knowledge of the PSP investigation, or his involvement in the investigation. *Id.* at 107-08. Trooper Zukowsky admitted that West and Wyatt were not searched prior to entering the C.I.'s vehicle and that he had no personal knowledge as to whether either possessed contraband at that time. *Id.* at 108-09. However, Trooper Zukowsky posited that if either West or Wyatt had provided the drugs, then it would be inconsistent with the conversations between West and the C.I. and with the actions of both in traveling to Appellant's residence in order to obtain the methamphetamine. *Id.* Trooper Zukowsky also admitted that he did not directly observe any of the activity that occurred in Appellant's residence, and that he did not witness any actual transaction between West and Appellant. *Id.* at 112-13.

Francis Carito ("Trooper Carito"), who has been a trooper with the PSP since 2011, testified that on July 17, 2018, he was assisting his partner, Trooper Zukowsky, in handling the C.I. during the investigation. *Id.* at 122. Trooper Carito helped search the C.I.'s vehicle prior to the controlled buy and he found no controlled substances, weapons, or currency during the search. *Id.* at 123. Trooper Carito also participate[d] in the surveillance of the C.I. traveling in his vehicle. *Id.* at 123-24. Trooper Carito further testified that he observed the C.I. pick up two individuals in Shoemakersville, and that he later saw Appellant approach the

C.I.'s vehicle as it was parked in the Turkey Hill parking lot. *Id.* at 124-25. Trooper Carito continued to assist Trooper Zukowsky on the C.I.'s return to the prearranged meeting location, whereupon the C.I. provided the clear plastic baggy containing the methamphetamine[,] and [he] subsequent[ly] search[ed] the C.I. and his vehicle. *Id.* at 126-27.

On July 23, 2018, Trooper Carito again participated in the controlled buy with Trooper Zukowsky and the same C.I. *Id.* at 128. Trooper Carito again participated in the search of the C.I. and his vehicle, during which no illegal weapons, contraband, or currency were found. *Id.* at 128-29. Similarly, Trooper Carito joined in the subsequent surveillance of the C.I., who picked up a male with a dog. *Id.* at 130. Upon completion of the controlled buy, and the return of the C.I. to the prearranged location, Trooper Carito again assisted in the search of the C.I. and his vehicle whereupon no contraband or currency was discovered, other than the purchased methamphetamine that the C.I. surrendered. *Id.* at 130-32.

Corporal Javier Garcia ("Corporal Garcia"), a seventeen-year veteran of the PSP and a member of the Southeast Strike Force, testified that on July 17, 2018, as he was part of the surveillance detail, he observed Appellant park and exit his pickup truck in his driveway on Eisenhauer Drive. *Id.* at 136-37. Corporal Garcia then saw Appellant meet up with a man in front of the house and the two entered the residence. *Id.* at 137. Approximately ten minutes later, both men exit[ed] the residence, [got] into the pickup truck, and [drove] to the Turkey Hill. *Id.* at 138-39. Corporal Garcia indicated that he was also part of the surveillance team following the C.I.'s vehicle as it traveled from the prearranged location to the Turkey Hill and back again, and he confirmed that he did not see anyone approach the vehicle or throw anything into the vehicle during those trips. *Id.* [at] 139.

Additionally, Corporal Garcia participated in the surveillance of the July 23, 2018, controlled buy. *Id.* [at] 140-41. During the second controlled buy, Corporal Garcia surveilled Appellant's residence where he observed Appellant, the C.I., and West looking at Appellant's pickup truck. *Id.* at 141. Corporal Garcia observed an exchange occur between the C.I. and Appellant in the driveway of Appellant's residence, though he admitted that he did not see exactly what was exchanged between the two. *Id.* at 142-43, 146.

Trooper Sean Taylor ("Trooper Taylor"), who has been with the PSP for twenty-two years, next testified that he participated in the surveillance of both controlled buys involving Appellant. *Id.* at 147-48. Trooper Taylor described watching the C.I. pick up West and Wyatt on July 17, 2018, and [he] confirmed that he did not see anyone else enter the vehicle or place anything inside the vehicle. *Id.* at 149. During the second controlled buy on July 23, 2018, Trooper Taylor assisted in surveillance and the search of the C.I.'s vehicle both prior to, and subsequent to, the controlled buy. *Id.* at 150. Trooper Taylor testified that no contraband, weapons, or currency were found pursuant to the search. *Id.* at 150-51. While surveilling the C.I.'s vehicle during the second controlled buy, Trooper Taylor did not observe anyone other than the C.I. and West enter the C.I.'s vehicle, or place anything else inside the vehicle. *Id.* at 151. On cross-examination, Trooper Taylor admitted that he did not search West, Wyatt, or the dog that accompanied the C.I. during the controlled buy. *Id.* at 152.

Joshua West next testified that he was facing various drug-related charges in Berks County related to the July 17 and July 23 controlled buys, and that no one had forced, threatened, or promised him anything concrete in return for his testimony, but that he was hoping for consideration. *Id.* at 154-56. West stated that he met Appellant two years prior at a gas station while he was filling his tires with air. *Id.* at 156-57. Appellant told West that he had tires to sell and the two met up again approximately two weeks later when West purchased the tires from Appellant. *Id.* at 157. During the second meeting, West and Appellant used methamphetamine together. *Id.* Subsequently, West began to obtain methamphetamine from Appellant on a regular basis of at least once a week. *Id.* at 158-59.

West continued that, approximately one week prior to July 17, 2018, Appellant asked West to help find a buyer for an ounce of methamphetamine. *Id.* at 160-61. West knew the C.I. through a long-time friend, and West and Appellant facilitated the drug purchase. *Id.* at 161. On July 17, 2018, West and the C.I. were communicating via text message and the C.I. then picked West and Wyatt up at West's residence. *Id.* at 161-62. During the car ride, the C.I. gave West $1,000 in cash. *Id.* at 164. Appellant had previously instructed West not to allow the C.I. to pull up directly in front of his home, so West directed the C.I. to stop about a block away, where West alighted [from] the vehicle. *Id.* at 163. The C.I. then proceeded with Wyatt to the Turkey Hill. *Id.*

- 6 -

West then walked the short distance to Appellant's residence, knocked on the door, and Appellant let West into the house. *Id.* Once inside the house, West gave the $1,000 to Appellant who proceeded downstairs and returned with a clear bag containing methamphetamine. *Id.* at 165-66. West testified that he planned on walking back to the Turkey Hill to meet with the C.I. and Wyatt, but Appellant insisted on driving West. *Id.* at 166. Appellant and West then drove in Appellant's pickup truck to the Turkey Hill, where they both exited the truck. *Id.* at 167. West stated that Appellant then approached the driver's side of the C.I.'s vehicle and introduced himself to the C.I. *Id.* As the two engaged in a brief conversation, Appellant made a hand-to-hand exchange of the bag containing the methamphetamine to the C.I. *Id.* Appellant then went into the store and West left in the C.I.'s vehicle with the C.I. and Wyatt. *Id.* at 168-69. The C.I. later dropped West and Wyatt off at a diner. *Id.* at 169.

On July 23, 2018, the C.I. arrived at West's residence and picked up West and his dog and then proceeded to Appellant's home. *Id.* at 171. During the car ride, the C.I. gave West the $1,000 in cash. *Id.* at 172-73. Upon arriving at Appellant's home, West testified that Appellant came out of the house and the two began to look at Appellant's pickup truck. *Id.* at 172. According to West, Appellant had orchestrated the deal, which was an exchange of $1,000 for an ounce of methamphetamine. *Id.* After looking at the pickup truck, both West and Appellant proceeded into Appellant's home. *Id.* at 173. Once again, West gave Appellant the $1,000 in cash, Appellant walked downstairs, and reemerged with the drugs in hand. *Id.* West and Appellant then continued back outside, where Appellant converse[d] with the C.I., during which Appellant hand[ed] off the drugs to the C.I. *Id.* at 174. Although West admitted that he did not actually see the hand off occur, he testified that the C.I. showed him the drugs on the way home. *Id.* at 175.

On cross-examination, Defense Counsel noted that West's recall events from July 17, 2018, differed from his earlier testimony at the preliminary hearing in that he earlier testified that Appellant approached the passenger side of the C.I.'s vehicle and talked with Wyatt. *Id.* at 180. West clarified that Appellant first approached the driver side of the C.I.'s vehicle, prior to entering the Turkey Hill, gave the C.I. the drugs, and then Appellant approached the passenger side upon exiting the Turkey Hill, whereupon Appellant [had] the conversation with Wyatt[.]

*Id.* at 180-81. West also admitted that Appellant had helped him by loaning West money and tools. *Id.* at 181-84.

Both parties stipulated that the substance obtained both on July 17, 2018, and July 23, 2018, were tested by Rebecca Patrick, a Forensic Scientist with the PSP Laboratory, who has previously testified as an expert witness in Pennsylvania courts. *Id.* at 186-87. Furthermore, the parties stipulated that the results of the testing indicated that the substances from both dates were, in fact, methamphetamine, a controlled substance under Pennsylvania law. *Id.*

At the conclusion of the trial on July 9, 2020, the jury found Appellant guilty of [the] charges [indicated *supra*]. Sentencing was deferred on request of Appellant. On July 23, 2020, th[e] [trial] court sentenced Appellant to an aggregate term of imprisonment of two and one-half (2½) years to eight (8) years, with four years of probation to follow.

On [Monday,] August 3, 2020, Appellant, through new counsel, filed timely post-sentence motions, which were denied by order dated August 5, 2020. Appellant filed his Notice of Appeal on August 13, 2020. On August 18, 2020, [the trial court] issued an order directing Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant filed his concise statement on September 8, 2020[,] [and the trial court filed an] opinion pursuant to Pa.R.A.P. 1925(a)[.]

Trial Court Opinion, filed 10/14/20, at 2-8 (footnotes in original).

In his first issue, Appellant contends the jury's verdict is against the weight of the evidence. Specifically, Appellant avers Joshua West's testimony regarding Appellant's participation in the controlled buys is purely self-serving, and thus unreliable, since West gave the testimony solely in the hopes of receiving favorable treatment from the Commonwealth for his role in the controlled buys. He further argues West's testimony is replete with

- 8 -

inconsistencies, and absent any supporting proof, the jury's verdict based thereon is against the weight of the evidence.[2]

When considering challenges to the weight of the evidence, we apply the following precepts. "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none[,] or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa.Super. 2015) (quotation marks and quotation omitted). Resolving contradictory testimony and questions of credibility are matters for the finder of fact. *Commonwealth v. Hopkins*, 747 A.2d 910, 917 (Pa.Super. 2000). It is well-settled that we cannot substitute our judgment for that of the trier of fact. *Talbert*, *supra*.

Moreover, appellate review of a weight claim is a review of the trial court's exercise of discretion in denying the weight challenge raised in the post-sentence motion; this Court does not review the underlying question of whether the verdict is against the weight of the evidence. *See id.*

> Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

---

[2] Appellant adequately preserved his weight claim in the lower court. *See* Pa.R.Crim.P. 607.

- 9 -

*Id.* at 546 (quotation omitted). Furthermore, "[i]n order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Id.* (quotation marks and quotation omitted).

Here, in rejecting Appellant's weight of the evidence claim, the trial court relevantly indicated the following:

> At trial, the Commonwealth presented the testimony [of] four separate members of the PSP who participated in the operation, including those who surveilled both the C.I. and Appellant throughout the controlled buys. The Commonwealth also presented Joshua West who testified that he participated, though unwittingly at the time, in the controlled buys, confirming the testimony of law enforcement officers.
>
> [The trial court's] recall of the testimony at trial, and [the court's] observation of the record notes of testimony, belie the allegations of Appellant. While it is true that West sought leniency in testifying on behalf of the Commonwealth, no agreement was promised or assured to West. Moreover, [the trial court] fail[s] to find demonstrable inconsistencies as alleged. There was no indication that West demonstrated any personal vendetta or animosity toward Appellant. In fact, upon cross-examination, it was revealed that West and Appellant had a fairly convivial relationship, with Appellant having helped West out with money and tools. Defense Counsel likewise attempted, through cross-examination, to point out inconsistencies in West's testimony, [but] no material inconsistency was demonstrated.
>
> Moreover, the jury was free to afford the weight and credibility it saw fit to the testimony and evidence presented at trial. It is clear from the verdicts rendered that the jury found the testimony of West to be credible. [The trial court] find[s] nothing in the jury's verdict that shocks the conscience of th[e] court or that is so contrary to the evidence as to characterize a miscarriage of justice. As such, we find that Appellant's [claim] lacks merit.

Trial Court Opinion, filed 10/14/20, at 9-10.

We conclude the trial court did not abuse its discretion in denying Appellant's challenge to the weight of the evidence. **Talbert**, **supra**. We note the jury was free to determine the weight to be given to West's testimony. Moreover, West specifically advised the jury that he was testifying because he was hoping for "some understanding and some lenience" from the Commonwealth in exchange for his testimony against Appellant. N.T., 7/9/20, at 155. The jury was free to weigh what effect, if any, West's desire for leniency had on his testimony implicating Appellant in the controlled buys.

Furthermore, to the extent Appellant points to an alleged inconsistency between West's preliminary hearing and trial testimony regarding whether Appellant approached the passenger side or driver side of the car at the Turkey Hill, we note Defense Counsel extensively cross-examined West on this issue. **Id.** at 180-81. The jury was free to weigh the alleged inconsistencies in West's testimony and judge the credibility of West's trial testimony. **Talbert**, **supra**. To the extent Appellant requests that we re-weigh the evidence and assess the credibility of the witnesses presented at trial, we decline to do so as it is a task that is beyond our scope of review. **See Commonwealth v. Collins**, 70 A.3d 1245, 1251 (Pa.Super. 2013) (stating that "[a]n appellate court cannot substitute its judgment for that of the finder of fact") (quotation omitted)). Accordingly, we find no merit to Appellant's weight of the evidence claim.

In his final issue, Appellant contends the trial court erred in the manner in which it conducted *voir dire*. He contends there was a "breakdown in the standard process for selecting a jury for trial[,]" *id.* at 20, and, thus, the jury selection process violated his right to an impartial jury, as well as notions of due process.[3]

"The Sixth and Fourteenth Amendments guarantee a defendant the right to, *inter alia*, an impartial jury, and this right extends to both the guilt and sentencing phases of trial." **Commonwealth v. Le**, 652 Pa. 425, 208 A.3d 960, 972 (2019) (citation omitted). Thus, the jury selection process is crucial to the preservation of a criminal defendant's constitutional right to an impartial jury. **See Commonwealth v. Hunsberger**, 619 Pa. 53, 58 A.3d 32 (2012).

> *Voir dire* plays a critical function in assuring the criminal defendant that his right to an impartial jury will be honored. Without an adequate *voir dire*, the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.
>
> While this Court has explained that the scope of *voir dire* is within the sound discretion of the trial court, the United States Supreme Court has stated that the exercise of the trial court's discretion,…[is] subject to the essential demands of fairness.

**Le**, **supra**, 208 A.3d at 972-73 (quotation marks, quotations, and citation omitted). **See Commonwealth v. Impellizzeri**, 661 A.2d 422, 427

---

[3] We note Appellant preserved his challenge to the jury selection process. N.T., 7/8/20, at 3-4.

(Pa.Super. 1995) (holding that, in reviewing a trial court's ruling on a challenge to the empaneling of a jury, "we employ a standard of review which affords great deference to the trial judge") (citation omitted)).

> [Moreover,] [t]he purpose of *voir dire* is solely to ensure the empaneling of a competent, fair, impartial, and unprejudiced jury capable of following the instructions of the trial court….*Voir dire* is not to be utilized as a tool for the attorneys to ascertain the effectiveness of potential trial strategies.

**Knight**, **supra**, 241 A.3d at 640 (quotation marks and quotation omitted).

> The decision whether to disqualify a prospective juror is to be made by the trial judge based on the juror's answers and demeanor and will not be reversed absent a palpable abuse of discretion. Appellate courts defer to the trial court's assessment of a prospective juror's answers during *voir dire* because the trial court is in the best position to assess the [prospective juror's] credibility and fitness to serve[.]
>
> Most importantly, we should give great weight to the trial court judge's decision about striking jurors because the trial court judge not only hears the words that the potential juror speaks, but also the manner in which the juror says those words and is in a better position than an appellate court to evaluate the significance of any hesitancy of a potential juror:
>
> > The juror appears before the trial judge, who sees him and hears what is said; and is able to form his opinion as much from the proposed juror's conduct as from the words which he utters, printed in the record. Hesitation, doubt, and nervousness indicating an unsettled frame of mind, with other matters, within the judge's view and hearing, but which it is impossible to place in the record, must be considered. As it is not possible to bring these matters to our attention, the trial judge's view should be given great weight in determining the matters before him.

*Shinal v. Toms*, 640 Pa. 295, 162 A.3d 429, 442 (2017) (citing *Commonwealth v. Gelfi*, 282 Pa. 434, 128 A. 77, 79 (1925)) (quotation marks, quotations, and citations omitted).

Instantly, Appellant contends the *voir dire* was inadequate, and thus, the trial judge's responsibility to remove prospective jurors who would not be able impartially to follow the court's instructions and evaluate the evidence was not fulfilled. Specifically, Appellant complains that "[t]he members of the entire venire were required to wear face coverings and were then spread out over a vast distance, far more spread out than is standard practice for *voir dire*, a minimum of six feet apart, for social distancing purposes." Appellant's Brief at 20-21. He contends that, because of these restrictions, the trial court was unable to fully examine the prospective jurors' conduct and demeanor in determining their credibility and fitness to serve, and consequently, Appellant was not ensured the empaneling of a competent, fair, impartial, and unprejudiced jury.

In its opinion, the trial court set forth the following reasons for denying Appellant's objection and requiring the prospective jurors to wear masks, as well as socially distance themselves, during *voir dire*:

> In December of 2019, a novel coronavirus began infecting humans in China, which by March of 2020, had spread throughout 144 countries, including the United States. *Friends of Danny DeVito v. Wolf*, 227 A.3d 872 (Pa. 2020)[.] On March 16, 2020, in response thereto, and upon request of the Commonwealth's Secretary of Health, the Pennsylvania Supreme Court declared a general, statewide judicial emergency because of the coronavirus that causes COVID-19.

- 14 -

In its March 16, 2020, declaration and in its subsequent extensions, the [Supreme] Court authorized the President Judges of each judicial district to likewise declare a judicial emergency within their district, and further "[t]o take any action permitted pursuant to Rule of Judicial Administration 1952(B)(2)." *In re Gen. Statewide Judicial Emergency*, 228 A.3d 1281 (Pa. 2020) [(*per curiam* order)]. Rule 1952(B)(2)(d) grants to the President Judge of a judicial district, in the event of an emergency, and upon authorization of our Supreme Court, to "take necessary action to provide for (i) the safety of court personnel, court users, and the public, and (ii) the security of court facilities, financial, and cash operations, equipment, and records[.]" PA ST J ADMIN 1952(B)(2)(d). Moreover, the Supreme Court's declaration likewise provided that "[t]o the degree practicable in light of the necessity for some in-person appearances and proceedings, safety measures should be employed that are as consistent as possible with the federal and state executive guidance associated with countering the spread of the COVID-19 virus." *In re Gen. Statewide Judicial Emergency*, 230 A.3d 1015, 1016 (Pa. 2020) [(*per curiam* order)]. On June 1, 2020, President Judge Parisi issued a Supplemental Emergency Order indicating that jury trials in the Court of Common Pleas of Berks County would resume "on or after June 15[, 2020], consistent with prevailing health and safety norms." *In Re: 23rd Judicial District*, Emergency Judicial Order No. 20-3264 (Berks C.P. June 1, 2020). The June 1, 2020, Supplemental Order also required [that] "[a]ll persons entering county buildings for court business will wear a mask covering their nose and mouth at all times, unless otherwise specifically permitted or directed by a judge." *Id.*

In accordance with the June 1, 2020, Supplemental Emergency Order, individuals reporting for the venire in Appellant's trial on July 8 and 9, 2020, were required to wear a mask upon entering, and throughout the duration of their presence in county buildings. While [the trial court] permitted counsel to remove their masks during *voir dire*, and permitted both counsel and witnesses to remove their masks during trial testimony, we granted no such exception for potential jurors who were socially distanced during *voir dire*, but were still congregated into a single auditorium. This decision reflected our understanding of policies in effect both in the Commonwealth generally, in accordance with the Centers for Disease Control and Prevention guidelines, and pursuant to the June 1, 2020, Supplemental Emergency Order from the President Judge.

- 15 -

\*\*

In the matter *sub judice*, the prospective jurors completed and submitted questionnaires pursuant to [Pa.R.Crim.P.] 631,[4] which were then provided to both the Commonwealth and Defense Counsel for review. During *voir dire*, Defense Counsel was neither prohibited nor prevented from presenting questions to the potential jury members. Similarly, neither Appellant nor Defense Counsel was sequestered away from the venireperson during the process and both were able to hear the responses to questions posed during the process of *voir dire*. Moreover, Appellant was not prejudiced by the health requirement that potential jurors, along with all other individuals admitted to the courthouse, were required to wear a mask, as the Commonwealth was subject to the same restriction.

The trial court makes the determination of whether to strike a juror for cause based on the prospective juror's answers to questions and demeanor. Our Supreme Court has held that "[t]he opportunity to observe the demeanor of the prospective juror and the tenor of the juror's answers is indispensable to the judge in determining whether a fair trial can be had in the community." ***Commonwealth v. Bachert***, 453 A.2d 931, 937 (Pa. 1982)[.] Moreover, "the scope and form of *voir dire* examination rests in the sound discretion of the trial judge, whose decisions will not be reversed absent a palpable abuse of discretion." ***Commonwealth v. Croll***, 480 A.2d 266, 272 (Pa.Super. 1984). "The purpose of *voir dire* is to draw out any bias or prejudice, and thereby facilitate the removal of jurors with predisposed opinions." ***Id.*** at 273. [In the case *sub judice*,] [b]ased on [the

---

[4] Relevantly, Pa.R.Crim.P. 631 provides the following:
(E) Prior to *voir dire*, each prospective juror shall complete the standard, confidential juror information questionnaire as provided in Rule 632. The judge may require the parties to submit in writing a list of proposed questions to be asked of the jurors regarding their qualifications. The judge may permit the defense and the prosecution to conduct the examination of prospective jurors or the judge may conduct the examination. In the latter event, the judge shall permit the defense and the prosecution to supplement the examination by such further inquiry as the judge deems proper.
Pa.R.Crim.P. 631(E).

trial] court's observations and the responses provided by the potential jurors, [the trial court] finds that this objective was achieved and Appellant was afforded a jury free of bias or prejudice. As such, we find no merit in Appellant's allegation of error.

Trial Court Opinion, filed 10/14/20, at 10-13 (citations omitted) (footnote added).

We agree with the trial court's sound reasoning. We conclude the trial court did not abuse its discretion as to the scope or form of the *voir dire* examination and abided by the "essential demands of fairness." **See Le**, **supra**, 208 A.3d at 973. There is no indication the trial court was unable to adequately view the prospective jurors, examine their conduct, or perceive any factors indicating an "unsettled frame of mind[.]" **Shinal**, **supra**, 162 A.3d at 442. In fact, the trial court indicated in its opinion that it was able to adequately assess the prospective jurors' answers during *voir dire* so as to determine, *inter alia*, whether to disqualify a prospective juror.

Moreover, we note the trial court did not arbitrarily require the prospective jurors to wear masks and socially distance during *voir dire*. Rather, faced with the COVID-19 pandemic, the trial court reasonably imposed these requirements and complied with governing safety measures employed by federal and state agencies, as well as our Supreme Court's emergency judicial orders. Simply put, we agree with the trial court that the masking and social distancing of the prospective jurors did not interfere with the sole purpose of *voir dire*: the "empaneling of a competent, fair, impartial, and

unprejudiced jury capable of following the instructions of the trial court."

***Knight***, ***supra***, 241 A.3d at 640 (quotation omitted).  Accordingly, we find no merit to Appellant's issue.

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 05/04/2021