J-A02043-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSHUA KABE GREEN | : | |
| | : | |
| Appellant | : | No. 110 WDA 2021 |

Appeal from the Judgment of Sentence Entered December 10, 2020
In the Court of Common Pleas of McKean County Criminal Division at
No(s):  CP-42-CR-0000622-2018

BEFORE:  OLSON, J., MURRAY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:              **FILED: JANUARY 21, 2022**

Joshua Kabe Green (Green) appeals from the judgment of sentence imposed in the Court of Common Pleas of McKean County (trial court) following his jury conviction of indecent assault of a person less than 13 years of age, corruption of a minor, indecent exposure and terroristic threats.[1] Green challenges the trial court's implementation of protocols to reduce the spread of the novel coronavirus disease ("Covid-19") and claims that the evidence was insufficient to sustain his conviction.  We affirm.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 3126(a)(7), 6301(a)(1)(ii), 3127(a), 2706(a)(1).

**I.**

This case stems from Green's sexual abuse of J.S. when she was 12-years old, over a period of approximately one year in 2016 while they lived in the same home and he served a parental role. J.S. is the biological niece of Green's wife, (Mother) who is raising J.S. and J.S.'s older brother (Brother)[2] as her children.

Prior to Green's August 2020 jury trial, defense counsel filed objections to the trial court's use of Covid-19 procedures including partially remote *voir dire* and face masking requirements. Arguing that these protocols deprived him of a fair trial, Green requested a stay until the proceedings could take place without these measures. The trial court denied his request, as the county was in a state of judicial emergency due to an increase in infection rates and the protocols complied with applicable government safety measures. Jury selection was conducted using both remote technology and in-person panels and Green's jury trial was held in the courtroom using face masks.

J.S. was 16-years old at the time of trial and she testified that during the relevant time period she was living with Mother, Brother and Green, who she called "Dad." (N.T. Trial, 8/18/20, at 53). J.S. and Green spent a great deal of time together alone "just hanging out" at night. (**See id.**). She

---

[2] Because J.S.'s brother shares her initials, we refer to him as Brother for ease of reference. We also note that Green and Mother were legally married at the time of trial, although Mother had filed for divorce.

described one summer night while Mother and Brother were asleep when Green "sat me on the counter . . . and he was a little close so I just got up." (*Id.* at 54). Green sat in a chair and J.S. sat in his lap because there were no other chairs, and he put his hands down the back of her clothing. Green had "a purplish-pinkish toy on his finger and it was like vibrating" and he touched her vagina with it and asked, "Does that feel good?" (*Id.* at 55, 58). J.S. ran to Mother's room and told her that Green "touched me." (*Id.* at 63). Green immediately came upstairs and asked J.S. if she had a bad dream. Mother told J.S. that she could sleep in her room and she and Green went downstairs.

J.S. further testified that she frequently saw Green's penis because he would urinate into bottles in front of her. Green asked J.S. to help with his "medical problem/bladder issue" and had her put condoms on his penis "like once a day" for about a year. (*Id.* at 60, 62, 69). J.S. testified that she did not tell Mother about the vibrating object or the condoms until Green no longer resided with them. J.S. also explained that when she first disclosed the incident to Children's Advocacy Center (CAC) personnel in 2017, she identified Brother as the perpetrator "because mom told me she was scared and she begged me for days that I would tell them that it was my brother." (*Id.* at 65).

On cross-examination, J.S. acknowledged that at the preliminary hearing, she testified that she put a condom on Green's penis approximately four times. (*See id.* at 70). She explained the discrepancy in her trial

testimony by stating that she "was really nervous" at that time of the previous hearing and "I'm older now and I can talk more about it." (*Id.*).

Mother testified that Green played a parental role in J.S.'s life for three years and he had a close relationship with her. Mother stated that on or about August 3, 2016, at about 3:30 a.m., J.S. ran into her bedroom and jumped in her bed as she "was frantic looking and she was just crying her eyes out" and said "[dad] touched me." (*Id.* at 89-90). Green came upstairs within seconds to see what the commotion was before he returned downstairs. J.S. "said that she was sitting on his lap and they were talking and he took his hand and he reached under her shorts but like on top of her underwear and rubbed her down there and she tried to get up and he kind of held her down a little bit." (*Id.* at 90). Mother "believed [J.S.] because of the way she was crying and very emotional. I felt the negative energy in the air." (*Id.* at 91). When Mother confronted Green, he "instantly turned white as a ghost" and denied the allegation. (*Id.* at 93). Mother indicated that she did not believe him and would go to the police and "he lunged at me . . . [and] grabbed me like by the base of my head up against the wall. He called me a f-ing b-word and said that [J.S.] was a liar. . . [He said] I will put a bullet in your head and then my own and then where would your kids be." (*Id.*). Because Mother was scared, she complied with Green's instruction to tell J.S. that she was lying about the incident and that she did not believe her. Green continued to live with them until Mother asked him to leave in July 2017.

In November 2017, while J.S. and Brother were residing with a different family member instead of with Mother, the incident with Green became the subject of a CAC investigation. Mother testified that she "begged [J.S.] to drop the [Green] statement and put blame on her brother because I was so scared of [Green] threatening my life." (*Id.* at 96). J.S. later shared additional information about the incident with Mother and described the vibrating object Green had placed on her, which Mother immediately recognized as a sex toy ring Green had for his penis. J.S. also disclosed the condoms and Green's purported "medical condition" in September 2018, at which point Mother and J.S. met with CAC and the police.

Brenda Manno was qualified as an expert witness in the field of sexual abuse evaluation of victim behaviors. She opined regarding delayed disclosures that less than 25% of victims immediately report abuse, and she explained that children are often concerned about the ramifications of disclosure. Ms. Manno also testified that in cases where a mother or mother-figure of a child doesn't fully support or take immediate action to protect the child, the recantation rate for a child retracting some of the allegations can be as high as 50%.

At the conclusion of trial,[3] the jury convicted Green of the above-mentioned offenses. On December 10, 2020, the trial court sentenced Green

_____

[3] The defense did not call any witnesses.

to an aggregate term of 18 months to 4 years of incarceration. Green timely appealed and he and the trial court complied with Rule 1925. *See* Pa.R.A.P. 1925(a)-(b).

## II.

On appeal, Green challenges the trial court's implementation of Covid-19 protocols including masking requirements and claims that the court's modified jury selection procedures violated his federal and state constitutional rights to a fair and impartial jury and due process. He maintains that the court should have granted his request for a stay pending resolution of the pandemic. Additionally, Green challenges the sufficiency of the evidence supporting his conviction because J.S. and Mother were dishonest with government authorities regarding the incident and delayed reporting it.

## A.

We first address Green's challenge to the trial court's use of Covid-19 protocols during *voir dire* and his jury trial. According to Green, the modified *voir dire* process and use of face masks deprived counsel of the opportunity to adequately assess the composition of the jury and fully observe the jurors' mannerisms and demeanor, rendering the entire process defective. Green also takes issue with the court's use of four staggered jury panels in light of Pa.R.Crim.P. 631, which he claims "suggests that all jurors should be present, at one time, for jury selection." (Green's Brief, at 57).

"The Sixth and Fourteenth Amendments guarantee a defendant the right to, *inter alia*, an impartial jury, and this right extends to both the guilt and sentencing phases of trial." **Commonwealth v. Le**, 208 A.3d 960, 972 (Pa. 2019) (citation omitted).

> *Voir dire* plays a critical function in assuring the criminal defendant that his right to an impartial jury will be honored. Without an adequate *voir dire*, the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. While this Court has explained that **the scope of *voir dire* is within the sound discretion of the trial court, the United States Supreme Court has stated that the exercise of the trial court's discretion . . . is subject to the essential demands of fairness**. Moreover, '**the purpose of *voir dire* is solely to ensure the empaneling of a competent, fair, impartial, and unprejudiced jury capable of following the instructions of the trial court**.' **Commonwealth v. Knight**, 241 A.3d 620, 640 (Pa. 2020). . . . *Voir dire* is not to be utilized as a tool for the attorneys to ascertain the effectiveness of potential trial strategies.

**Commonwealth v. Delmonico**, 251 A.3d 829, 838–39 (Pa. Super. 2021), *appeal denied*, 2021 WL 4983055 (Pa. 2021) (some citations and quotation marks omitted; emphasis added).

In **Delmonico**, the defendant contended that the trial court's masking and social distancing requirements during *voir dire* violated his right to an impartial jury, as well as notions of due process because he was unable to fully examine the prospective jurors' conduct and demeanor in determining their fitness to serve. We rejected the defendant's claim of inadequacy in the proceedings and noted the court's protocols were not arbitrary and were instead "reasonably imposed [in accordance] with governing safety measures

employed by federal and state agencies, as well as our Supreme Court's emergency judicial orders." **Id.** at 842.  We also determined that "masking and social distancing of the prospective jurors did not interfere with the **sole** purpose of *voir dire*:  the 'empaneling of a competent, fair, impartial, and unprejudiced jury capable of following the instructions of the trial court.'" **Id.** (quoting **Knight**, **supra** at 640; emphasis added).

Likewise, the record in the instant case reflects that emergency health circumstances dictated that the trial court implement appropriate safety measures for the benefit of prospective jurors, the parties and court personnel in order to continue to move forward with the criminal trial.  Although Green has raised general allegations of unfairness in the form of the proceedings, he has not demonstrated any actual prejudice or explained how the outcome of his trial would have been impacted if he had been fully able to view the juror's faces or if *voir dire* had been conducted in a single in-person session.  Instead, the record shows that the court implemented procedures that have since become routinely used as a means of lessening the spread of Covid-19 infection in public spaces.  To the extent that Green claims entitlement to a stay "pending resolution" of the pandemic, we point out that the pandemic is

still ongoing approximately a year-and-a-half after his jury trial. Green's claims challenging the trial court's Covid-19 protocols merit no relief.[4]

**B.**

Green next challenges the sufficiency of the evidence supporting his convictions for incent assault, corruption of a minor, indecent exposure and terroristic threats[5] by pointing to J.S. and Mother's initial dishonesty to

---

[4] With regard to Green's contention that Rule 631 suggests that all jurors should be present at one time for jury selection, the language of the Rule contains no such express requirement. To the contrary, the Rule contemplates that prospective jurors may be examined individually, outside of the presence of one another. *See* Pa.R.Crim.P. 631, 1(a), 2(b).

[5] "A person is guilty of indecent assault if the person has indecent contact with the complainant, causes the complainant to have indecent contact with the person, or intentionally causes the complainant to come into contact with seminal fluid, urine or feces for the purpose of arousing sexual desire in the person or the complainant and . . . the complainant is less than 13 years of age[.]" 18 Pa.C.S. § 3126(a)(7).

Corruption of a Minor is defined, in relevant part, as: "Whoever, being of the age of 18 years and upwards, by any course of conduct in violation of Chapter 31 (relating to sexual offenses) corrupts or tends to corrupt the morals of any minor less than 18 years of age, or who aids, abets, entices or encourages any such minor in the commission of an offense under Chapter 31 commits a felony of the third degree." 18 Pa.C.S. § 6301(a)(1)(ii).

"A person commits indecent exposure if that person exposes his or her genitals in any public place or any place where there are present other persons under circumstances in which he or she knows or should know that this conduct is likely to offend, affront or alarm." 18 Pa.C.S. § 3127(a).

A defendant commits the offense of terroristic threats "if the person communicates, either directly or indirectly, a threat to: (1) commit any crime of violence with intent to terrorize another." 18 Pa.C.S. § 2706(a)(1).

authorities in naming Brother as the perpetrator. Green does not dispute any specific element(s) of the crimes, but rather makes an argument based on credibility by emphasizing the discrepancy between J.S.'s preliminary hearing and trial testimony regarding the number of instances she placed a condom on Green's penis, *i.e.*, four times versus once a day for about a year.[6] Although Green acknowledges that the jury is charged with making credibility determinations, he maintains that no reasonable juror could have resolved the credibility issues in this case in favor of J.S. and Mother.

It is well-settled that the uncorroborated testimony of a sexual assault victim, if believed by the trier of fact, is sufficient to convict a defendant. *See Commonwealth v. Charlton*, 902 A.2d 554, 562 (Pa. Super. 2006), *appeal denied*, 911 A.2d 933 (Pa. 2006). At trial, J.S. and Mother testified

---

[6]

> When reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. **It is within the province of the fact-finder to determine the weight to accord each witness' testimony and to believe all, part or none of the evidence**. The Commonwealth may sustain its burden by proving every element of the crime by means of wholly circumstantial evidence. As an appellate court, we may not re-weight the evidence and substitute our judgment for that of the fact-finder.

*Commonwealth v. Snyder*, 251 A.3d 782, 787–88 (Pa. Super. 2021) (citation omitted; emphasis added).

consistently with one another regarding the details of the incident where Green placed the vibrating penis ring on J.S.'s vagina and to his pattern of asking her for assistance with his "medical condition" involving condoms on his penis. Furthermore, to the extent Green points to inconsistencies between J.S.'s preliminary hearing and trial testimony, we note that defense counsel thoroughly cross-examined J.S. on this issue and she explained her nervousness at the earlier hearing. The jury was free to consider any conflicts in J.S.'s testimony and assess the overall credibility of her trial testimony.

Insofar as Green takes issue with the reporting delay and the initial accusation against Brother rather than him, the Commonwealth's expert testified generally that it is common for child sexual abuse victims to delay reporting, and that recantation of allegations occurs at a very high rate in instances when the mother-figure does not immediately believe or support the child. Here, the testimony reflects that Mother was initially vocal against naming Green because he threatened to "put a bullet in her head" and she was frightened for her well-being and that of her niece and nephew. Based on the foregoing, we conclude that Green's sufficiency of the evidence claim fails.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/21/2022