J-S01032-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JAMES ARTHUR CORBETT | : | |
| | : | |
| Appellant | : | No. 496 MDA 2021 |

Appeal from the Judgment of Sentence Entered October 22, 2020
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0002239-2019

BEFORE:   BOWES, J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED:  MAY 24, 2022**

Appellant, James Arthur Corbett, appeals from the judgment of sentence imposed following his conviction of four counts of possession with intent to deliver a controlled substance ("PWID"), corrupt organizations, and criminal conspiracy to commit corrupt organizations.[1]

On March 17, 2018, Alan Bocchini, Jr. was found dead in a bathroom of his workplace, a factory in York County.  It was later determined that Bocchini died of an overdose of heroin and fentanyl.  Police arrested Bocchini's dealer, Kayleigh Hess, in August 2018, and she confirmed that she had sold opioids to Bocchini on the day of his death.  Hess also informed police that she had purchased the drugs she sold to Bocchini from Appellant, her dealer whom

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 35 P.S. § 780-113(a)(30) and 18 Pa.C.S. § 911(b)(3), (4), respectively.

she knew by the name of "Sha." Detectives arranged for Hess to make two controlled purchases on August 28 and August 29, 2018 from "Sha"; on each occasion, she purchased ten packets of a white substance that tested positive for fentanyl and acetyl fentanyl, a fentanyl derivative.

Detectives also worked with another confidential informant, Linda Johnson, who bought drugs from Appellant, whom she knew as "D." Johnson performed two controlled purchases from Appellant on August 29 and October 16, 2018. During the first purchase, Appellant sold Johnson ten packets of fentanyl and acetyl fentanyl and the second sale consisted of ten glassine bags containing fentanyl.

Appellant was arrested and charged in relation to Bocchini's overdose death as well as the four subsequent controlled purchases. The charges against Appellant included drug delivery resulting in death, five counts of PWID, criminal conspiracy to commit drug delivery resulting in death, criminal conspiracy to commit PWID, corrupt organizations, and criminal conspiracy to commit corrupt organizations.[2] A jury trial commenced on September 14, 2020. On September 18, 2020, the jury found Appellant guilty of four counts of PWID, corrupt organizations, and conspiracy to commit same; each of these charges related to the controlled purchases in August and October 2018.

_____

[2] 18 Pa.C.S. § 2506(a), 35 P.S. § 780-113(a)(30), 18 Pa.C.S. § 903(a)(1), and 18 Pa.C.S. § 911(b)(3), (4), respectively.

Appellant was acquitted of the remaining charges relating to Bocchini's overdose death.

On October 22, 2020, the trial court sentenced Appellant to an aggregate sentence of 23 ½ to 47 years' imprisonment, consisting of 5-to-10-year sentences on each of the PWID counts and a 42-to-84-month sentence on the corrupt organizations charge.[3]  Each of the sentences were imposed consecutively.  Appellant then filed a post-sentence motion in which he raised the three issues argued in this appeal.  The trial court denied the post-sentence motion on April 7, 2021.  Appellant thereafter filed this timely appeal.[4]

Appellant raises the following issues for our review:

I.  Whether the evidence was insufficient to support the verdict as to possession with intent to deliver (4 counts), corrupt organizations and criminal conspiracy to corrupt organizations, in that it was not established [that] Appellant delivered drugs or was involved in a conspiracy.

II.  Whether the verdicts as to possession with intent to deliver (4 counts), corrupt organizations and criminal conspiracy to corrupt organizations were against the greater weight of the evidence, in

_____

[3] The conspiracy to commit corrupt organizations count merged with corrupt organizations for purpose of sentencing.

[4] The trial court filed an opinion explaining its rationale for denying Appellant's post-sentence motion on April 19, 2021.  After the notice of appeal was filed, the trial court directed Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, which Appellant did on April 29, 2021.  On May 27, 2021, the trial court filed a Rule 1925(a) opinion in which it largely relied on its earlier opinion with additional analysis pertaining to Appellant's weight-of-the-evidence claim.

that it was not established [that] Appellant delivered drugs or was involved in a conspiracy.

III.   Whether the honorable trial court erred and abused its discretion in sentencing Appellant to 23 ½ to 47 years.

Appellant's Brief at 4 (unnecessary capitalization omitted; issues reordered for ease of disposition).

Appellant first challenges the sufficiency of the evidence related to each of his convictions.[5]   A challenge to the sufficiency of the evidence presents a question of law and is subject to plenary review under a *de novo* standard. ***Commonwealth v. Smith***, 234 A.3d 576, 581 (Pa. 2020).  When reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth, were sufficient to prove every element of the offense beyond a reasonable doubt.  ***Id.***   "[T]he facts and circumstances established by the Commonwealth need not preclude every

---

[5] We note that the portions of Appellant's brief related to his sufficiency and weight-of-the-evidence arguments are largely duplicative of each other.  As our Supreme Court has explained, sufficiency and weight challenges are distinct claims, with sufficiency relating to the legal issue of whether, viewing the evidence in the light most favorable to the Commonwealth, the elements of the crime are proven beyond a reasonable doubt.  ***Commonwealth v. Widmer***, 744 A.2d 745, 751 (Pa. 2000).  A weight claim, by contrast, concedes that sufficient evidence exists to support the verdict but asks the trial court to exercise its discretion to determine whether certain facts established at trial are so clearly of a greater weight that to ignore them would deny the defendant justice.  ***Id.*** at 751-52; ***see also Commonwealth v. Smyser***, 195 A.3d 912, 916 (Pa. Super. 2018) (question of witness's credibility goes to weight, not sufficiency, of the evidence).  Here, we address Appellant's specific arguments as they properly relate to the distinct sufficiency and weight-of-the-evidence claims.

possibility of innocence." *Commonwealth v. Bowens*, 265 A.3d 730, 740 (Pa. Super. 2021) (*en banc*) (citation omitted). "The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." *Id.* (citation omitted). Finally, we note that the trier of fact has the authority to determine the weight of the evidence and credibility of the witnesses and is free to believe all, part, or none of the evidence. *Id.* at 741.

The jury convicted Appellant of four counts of PWID, one count of corrupt organizations, and one count of criminal conspiracy to commit corrupt organizations. With respect to Appellant's PWID convictions, the Controlled Substance, Drug, Device and Cosmetic Act prohibits "the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act." 35 P.S. § 780-113(a)(30). Delivery is defined as "the actual, constructive, or attempted transfer from one person to another of a controlled substance . . . whether or not there is an agency relationship." 35 P.S. § 780-102(b).

"Thus, for a defendant to be liable . . . for the delivery of a controlled substance there must be evidence that he knowingly made an actual, constructive, or attempted transfer of a controlled substance to another person without the legal authority to do so." *Commonwealth v. Ellison*, 213 A.3d 312, 319 (Pa. Super. 2019) (quoting *Commonwealth v. Murphy*, 844 A.2d 1228, 1234 (Pa. 2004)). "A defendant actually transfers drugs whenever he physically conveys drugs to another person." *Id.* (citation

- 5 -

omitted). There is no requirement that an exchange of money take place or that the defendant transfers the drugs to a law enforcement officer; "all that is necessary is that the transfer be between two people." ***Id.*** (citation omitted).

With respect to Appellant's convictions for corrupt organizations and conspiracy to commit corrupt organizations, Section 911 of the Crimes Code provides as follows:

> (b) Prohibited activities.--
>
>     \*    \*     \*
>
> (3) It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.
>
> (4) It shall be unlawful for any person to conspire to violate any of the provisions of paragraphs (1), (2) or (3) of this subsection.

18 Pa.C.S. § 911(b)(3), (4). An enterprise is defined as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity, engaged in commerce and includes legitimate as well as illegitimate entities and governmental entities." 18 Pa.C.S. § 911(h)(3). "Racketeering activity" includes the commission of an act punishable as PWID under the Controlled Substance, Drug, Device and Cosmetic Act, and a "[p]attern of racketeering activity[] refers to a course of conduct requiring two or more acts of racketeering activity[.]" 18 Pa.C.S. § 911(h)(1)(ii), (4).

To prove that Appellant was guilty of the conspiracy charge, the Commonwealth was required to establish that Appellant:

> 1) entered into an agreement to commit or aid in an unlawful act with another person or persons; 2) with a shared criminal intent; and 3) an overt act was done in furtherance of the conspiracy. The conduct of the parties and the circumstances surrounding such conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt. The conspiratorial agreement can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode.

*Commonwealth v. Rogal*, 120 A.3d 994, 1001 (Pa. Super. 2015) (citation omitted).

Appellant argues that there was insufficient evidence to support his convictions as police did not observe any of the actual transfers of drugs to the confidential informants and there were no records of Appellant's communications or scientific evidence offered to support the Commonwealth's case. Appellant also notes that police did not recover any marked funds from him after the controlled purchases and only one of the two confidential informants, Kayleigh Hess, testified at trial.[6] Appellant further argues that the Commonwealth failed to show that he was engaged in an enterprise with any other individuals. Appellant contends that, despite Hess's testimony that she

---

[6] The other confidential informant, Linda Johnson, was deceased at the time of trial.

accompanied him on visits to New York City, she did not testify that she witnessed the actual drugs that were allegedly brought back to York.

In its April 19, 2021 opinion in support of its order denying Appellant's post-sentence motion, the trial court thoroughly summarized the evidence adduced at trial relating to Appellant's convictions. Trial Court Opinion, 4/19/21, at 1-11. This evidence includes the testimony of detectives with the York City Police Department regarding the four controlled purchases from Appellant, including the detectives' search of the confidential informants before the transaction occurred, their provision of official funds to the informants, the surveillance of the transactions and Appellant's subsequent movements, and recovery of the purchased opioids from the informants afterward. *Id.* at 1-10. This testimony showed that another individual, Alexis Weedon, accompanied Appellant to the first controlled purchase and that Appellant used Weedon's car and repeatedly visited Weedon's house before and after the second and third purchases, which both took place on the same day. *Id.* at 5-8. In addition, the trial court summarized Hess's testimony regarding the two controlled purchases in which she participated; Hess also testified that she accompanied Appellant and another male to New York City on at least two occasions to buy drugs and act as Appellant's "drug tester" and that Appellant referred her to one of his associates, Curtis Ford, as a source for drugs after the controlled purchases at issue in this case. *Id.* at 10-11.

The trial court also comprehensively addressed Appellant's sufficiency arguments, concluding that the evidence supported each of Appellant's convictions. *Id.* at 11-19. The trial court concluded that, in addition to Hess's testimony as to her participation in two of the controlled purchases, there was a "surfeit of circumstantial evidence" to establish that Appellant engaged in four deliveries of fentanyl and/or acetate fentanyl to the confidential informants.[7] *Id.* at 13-15 (citing **Ellison**, 213 A.3d at 319-20, which held that officers' detailed testimony regarding controlled purchases of drugs, including the provision of buy money and recovery of drugs afterwards, was sufficient evidence to support PWID conviction, even in absence of confidential informant's testimony).

The trial court further explained that the record supported the jury's conclusion that Appellant was a part of a criminal enterprise involved with the purchase and sale of opioids based upon such evidence as the involvement of Weedon in three of the transactions, Appellant's referral to Hess of his associate, Flood, as another source of drugs, and Hess's own role in traveling to New York with Appellant and an unknown individual to assist in drug purchases. *Id.* at 15-18. The trial court additionally concluded that the evidence established the required "pattern of racketeering activity" based upon Appellant's four drug transactions that formed the basis of his PWID

---

[7] The parties stipulated as to the results of the chemical testing of the substances recovered from the confidential informants after the controlled purchases. N.T. (Trial), at 594-600.

convictions and that there was clear evidence of a conspiracy based upon the agreement of Appellant, Weedon, Hess, and others to their ongoing roles in the drug vending enterprise. *Id.* at 16-18; *see also Commonwealth v. Dellisanti*, 876 A.2d 366, 370 (Pa. 2005) (four sales of drug paraphernalia from store constitute a pattern of racketeering activity); *Commonwealth v. McCurdy*, 943 A.2d 299, 302-03 (Pa. Super. 2008) (four drug dealers who traveled together and pooled money for purchases and sold drugs out of same house were associated together as an enterprise for purpose of corrupt organizations statute).

Upon review, we conclude that the trial court has accurately described the relevant evidence of record, set forth the applicable law, and correctly determined that Appellant's sufficiency of the evidence claims lack merit. Accordingly, we rely on the trial court's well-reasoned April 19, 2021 opinion with respect to Appellant's sufficiency claims. *See* Trial Court Opinion, 4/19/21, at 1-19.

Appellant next argues that his convictions were against the weight of the evidence. We are guided by the following principles when reviewing a claim that the verdict is against the weight of the evidence. "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none or some of the evidence and to determine the credibility of witnesses." *Commonwealth v. Clemens*, 242 A.3d 659, 667 (Pa. Super. 2020) (citation omitted). A verdict will only be reversed as against the weight of the evidence where the evidence is "so tenuous, vague and uncertain that the verdict

shocks the conscience of the court." ***Commonwealth v. Delmonico***, 251 A.3d 829, 837 (Pa. Super. 2021) (citation omitted).  The factfinder is charged with the responsibility to resolve contradictory testimony and questions of credibility, and we may not substitute our judgment in place of the factfinder. ***Commonwealth v. Cramer***, 195 A.3d 594, 600 (Pa. Super. 2018).

A motion for a new trial based on a weight-of-the-evidence claim is addressed to the discretion of the trial court, and therefore we review only the lower court's exercise of discretion and not the underlying question of whether the verdict is against the weight of the evidence. ***Commonwealth v. James***, 268 A.3d 461, 468 (Pa. Super. 2021).  When reviewing a trial court's determination on a weight claim, we give the "gravest consideration to the findings and reasons advanced by the trial judge" because it is the trial judge, not the appellate court, that had the opportunity to see and hear the evidence presented. ***Delmonico***, 251 A.3d at 837 (citation omitted).

Appellant argues that the verdict was against the weight of the evidence as one of the Commonwealth's principal witnesses, Hess, was unreliable and not credible.  Appellant argues that this Court should apply "great scrutiny" to Hess as she was facing a maximum of 232 years in jail on a variety of drug charges, but in exchange for her testimony the Commonwealth had agreed to an aggregate sentence of one year less one day to two years less two days of incarceration followed by seven years of probation.  Appellant's Brief at 15; ***see also*** N.T. (Trial), at 328-42.  Appellant contends that the veracity of Hess's testimony is called into question by the fact that she testified that her

- 11 -

practice was to always buy opioids from Appellant in bulk, yet for each of the two controlled purchases that she participated in, the fentanyl was sold in a bundle of ten small packages. *See* N.T. (Trial), at 242, 314, 501, 512, 594-97. Appellant further argues that the evidence of his conviction was undermined based upon the fact that the phone recovered from Appellant during his March 6, 2019 arrest did not match the number given by the confidential sources and that the video shown of Appellant from one of the August 29, 2018 controlled purchases had an August 19, 2018 date stamp. *See id.* at 563-66.

Addressing the weight claim, the trial court concluded that, in addition to the "independent police observations" of Appellant's drug dealing, "clearly, the jury resolved the question of Ms. Hess'[s] credibility in her favor." Trial Court Opinion, 5/27/21, at 3. The trial court likewise found Hess to be a credible witness. *Id.*

> Ms. Hess did not avail herself of an easy opportunity to embellish or overstate in her testimony and that undermines Appellant's claim that her testimony was contrived and unreliable. [] Appellant's arguments repeatedly sound in arguing disparate facts through a lens that only matches his subjective view of the issues. The jury considered the totality of the evidence in the case, including Ms. Hess'[s] troubled background, for which [Appellant] was significantly responsible as her drug dealer. They found her testimony to be corroborated by the other evidence of record and found Appellant guilty beyond a reasonable doubt. Appellant's arguments do not state a basis for legal relief [on a weight-of-the-evidence claim], but merely seek to factually relitigate nuances of testimony that the jury already considered.

*Id.* at 3-4; *see also* Trial Court Opinion, 4/19/21, at 20-21.

We discern no abuse of discretion in the trial court's determination that the jury verdict was not against the weight of the evidence. As the court explained, the jury acted within its authority as factfinder in finding Hess's testimony credible and in resolving conflicts in the evidence in favor of the Commonwealth. Appellant's second appellate issue thus merits no relief.

In his final issue, Appellant argues that the trial court abused its discretion in imposing the sentence of 23 ½ to 47 years' imprisonment by misapplying the sentencing guidelines, running Appellant's PWID sentences consecutively, considering improper factors, and not sufficiently explaining the aggravated range sentence on the corrupt organizations count. A challenge to the discretionary aspect of a sentence is not appealable as of right. **_Commonwealth v. Akhmedov_**, 216 A.3d 307, 328 (Pa. Super. 2019) (*en banc*).

> Rather, an appellant challenging the sentencing court's discretion must invoke this Court's jurisdiction by (1) filing a timely notice of appeal; (2) properly preserving the issue at sentencing or in a motion to reconsider and modify the sentence; (3) complying with Pa.R.A.P. 2119(f), which requires a separate section of the brief setting forth "a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence[;]" and (4) presenting a substantial question that the sentence appealed from is not appropriate under the Sentencing Code[.]

**_Id._** (citation omitted). Only once the appellant has satisfied each of the four requirements to invoke our jurisdiction will we proceed to review the merits of the discretionary sentencing issue under an abuse of discretion standard. **_Id._** at 328-29.

Appellant filed a timely notice of appeal, preserved his sentencing issues in his post-sentence motion, and included a Rule 2119(f) statement in his brief. We, therefore, must review the Rule 2119(f) statement to determine whether Appellant has raised a substantial question. A substantial question is present where the appellant advances an argument that the sentence was inconsistent with a specific provision of the Sentencing Code or contrary to the fundamental norms underlying the sentencing process. *Id.* at 328.

Appellant argues in his Rule 2119(f) statement that the trial court erred in calculating his offense gravity score ("OGS"); this claim raises a substantial question. *See Commonwealth v. Sunealitis*, 153 A.3d 414, 421 (Pa. Super. 2016); *Commonwealth v. Archer*, 722 A.2d 203, 210-11 (Pa. Super. 1998) (*en banc*). Appellant also asserts that the trial court improperly double counted his prior record when it was already taken into account in the sentencing guidelines, a claim which also presents a substantial question. *See Commonwealth v. Goggins*, 748 A.2d 721, 731 (Pa. Super. 2000) (*en banc*). Furthermore, Appellant has raised substantial questions to the extent he argues that the trial court considered an improper sentencing factor and failed to state sufficient reasons for imposing a sentence in the aggravated range. *See Commonwealth v. Derrickson*, 242 A.3d 667, 680 (Pa. Super. 2020); *Commonwealth v. Macias*, 968 A.2d 773, 776 (Pa. Super. 2009).

However, we conclude that Appellant's claim that the trial court's imposition of consecutive sentences on his four PWID convictions resulted in an excessive aggregate sentence does not raise a substantial question.

Generally, an excessiveness claim based upon the trial court running sentences consecutively, rather than concurrently, is not deemed to be a substantial question. *Commonwealth v. Radecki*, 180 A.3d 441, 468-70 (Pa. Super. 2018); *Commonwealth v. Caldwell*, 117 A.3d 763, 769 (Pa. Super. 2015) (*en banc*). "Rather, the imposition of consecutive rather than concurrent sentences will present a substantial question in only 'the most extreme circumstances, such as where the aggregate sentence is unduly harsh, considering the nature of the crimes and the length of imprisonment.'" *Caldwell*, 117 A.3d at 769 (quoting *Commonwealth v. Lamonda*, 52 A.3d 365, 372 (Pa. Super. 2012) (*en banc*)).

Here, Appellant argues simply that the four drug sales occurred over a brief time period, and therefore the Commonwealth had probable cause to arrest and charge him after the first sale. Appellant's Brief at 10. We find that Appellant has not demonstrated "extreme circumstances" that warrants our review of this discretionary sentencing issue. *Caldwell*, 117 A.3d at 769 (citation omitted); *see also Radecki*, 180 A.3d at 470 (concluding that, even if court reached merits of discretionary sentencing issue related to imposition of consecutive sentences, appellant was not entitled to a "volume discount for committing multiple crimes").

Turning to the merits of Appellant's sentencing claims, our standard of review for challenges to the discretionary aspects of sentencing is as follows:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse

of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Watson*, 228 A.3d 928, 936-37 (Pa. Super. 2020) (citation omitted).

We first review Appellant's claim that the trial court improperly calculated his OGS on the PWID offenses as 9 when it should have been 8. While Appellant acknowledges that he had several past convictions of PWID and other felony drug offenses, he asserts that because there was no record of the kind of drug involved in those past crimes, they cannot be considered prior offenses for the purpose of calculating his OGS. With Appellant's prior record score of 5 and an OGS of 8, the sentencing guidelines called for a standard range minimum sentence of 27 to 33 months for his PWID convictions with an aggravated range sentence of up to 42 months. 204 Pa. Code § 303.16(a). With an OGS of 9, the guidelines provided for a standard range minimum sentence of 48 to 60 months and an aggravated range sentence of up to 72 months. *Id.* As stated above, Appellant's minimum sentence on each of his PWID counts was 5 years, or 60 months. The trial court deemed the OGS for the PWID counts to be a 9 over Appellant's objections. N.T., 10/22/20, at 6-8, 22.

While a question related to the misapplication of the sentencing guidelines constitutes a challenge to the discretionary aspects of sentencing, "[t]he calculation of the offense gravity score is a matter of statutory

interpretation, which raises a question of law." ***Sunealitis***, 153 A.3d at 421. Therefore, we apply a *de novo* review to this issue. ***Id.*** "An improper calculation of the offense gravity score affects the outcome of the sentencing recommendations, resulting in an improper recommendation, thereby compromising the fundamental norms which underlie the sentencing process." ***Id.*** (quoting ***Archer***, 722 A.2d at 210-11). When sentencing a defendant convicted of a felony or misdemeanor, the trial court must consider the guidelines. ***Id.*** Furthermore, where the trial court purports to sentence the defendant within the guidelines but applies the guidelines erroneously, an appellate court must vacate the sentence. 42 Pa.C.S. § 9781(c)(1).

Appellant's argument is premised upon his assertion that the sentencing guidelines provide that delivery of under 1 gram of fentanyl and its derivatives and analogues—the quantity of the sales applicable to the four PWID counts in this case—has an OGS of 8. However, our review contradicts Appellant's interpretation of the guidelines. In 2018, the Pennsylvania Commission on Sentencing issued the Supplement to Amendment 4 of the 7th Edition of the guidelines, with an effective date of June 1, 2018; the Supplement provides that the OGS for PWID of under 1 gram of fentanyl was 9. ***See*** 204 Pa. Code § 303.15 (effective June 1, 2018). Therefore, at the time Appellant committed the four controlled purchases that led to his PWID charges in August and October 2018, the appropriate OGS was 9. ***See*** 204 Pa. Code § 303.1(c) ("The sentencing guidelines shall apply to all offenses committed on or after the effective date of the guidelines. Amendments to the guidelines shall apply

to all offenses committed on or after the date the amendment becomes part of the guidelines."); *Commonwealth v. Greene*, 702 A.2d 547, 552 n.9 (Pa. Super. 1997). Subsequent to October 2018, in Amendment 5 to the 7th Edition, the Pennsylvania Commission on Sentencing revised the guidelines to reduce the OGS for PWID of under 1 gram of fentanyl from 9 to 8, where the guideline remained at the time of Appellant's sentencing. *See* 204 Pa. Code § 303.15 (effective January 1, 2020).

Accordingly, the trial court did not err in applying the sentencing guidelines, but rather the court correctly calculated the OGS for the PWID counts as 9. Moreover, we observe that the 60-month minimum sentences imposed by the trial court for each of the four counts fell within the standard guideline range based upon the proper application of an OGS of 9.

Next, we address Appellant's argument that the trial court did not state sufficient reasons to deviate from standard guidelines for the corrupt organizations conviction and sentence him in the aggravated range.[8] Although Appellant was sentenced in the aggravated range on this count, his sentence was within the sentencing guidelines and therefore we may only vacate his sentence "where the application of the guidelines would be clearly unreasonable." 42 Pa.C.S. § 9781(c)(2). In making this determination, we

_____

[8] The OGS for corrupt organizations was 8 and therefore the standard range minimum sentence under the guidelines was 27 to 33 months with an aggravated range sentence of up to 42 months. 204 Pa. Code §§ 303.15, 303.16(a); N.T., 10/22/20, at 22. The trial court imposed a sentence of 42 to 84 months' imprisonment.

must consider the following factors set forth in Section 9781(d) of the Sentencing Code:

> (1) The nature and circumstances of the offense and the history and characteristics of the defendant.
>
> (2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation.
>
> (3) The findings upon which the sentence was based.
>
> (4) The guidelines promulgated by the commission.

42 Pa.C.S. § 9781(d).

At sentencing, the trial court noted that it had reviewed the pre-sentence investigation report ("PSI") and considered the Appellant's age and health issues as well as the representations and argument of his counsel. N.T., 10/22/20, at 21-22. The trial court took into account Appellant's "lengthy" and "regular ongoing" history of criminal convictions over the course of more than 30 years, including two other drug-delivery convictions, concluding that he had a lack of any rehabilitative potential. *Id.* at 22-24, 30-31.

The trial court also discussed at length the severe impact of the fentanyl-opioid epidemic on the community and, more acutely, on victims such as Kayleigh Hess. *Id.* at 25-28. The trial court stated that Appellant did not create the epidemic and he was not at the top of the chain of drug dealers, but he was an "entrepreneur" who saw a "business opportunity . . . and decided he was going to prey on that pain and that opportunity for profit." *Id.* at 28. Appellant was "not a minor drug dealer supporting his habit[, but]

- 19 -

a significant player[,] an organizer and [] a distributor to other dealers." *Id.* at 31. The trial court found that Appellant lacked any remorse or empathy and was highly likely to re-engage in similar conduct upon release. *Id.* at 30-32.

With respect to the trial court's decision to impose an aggravated range sentence on the corrupt organizations count, the court stated that the sentence was imposed in light of Appellant's ongoing, drug-dealing enterprise trafficking significant quantities of drugs across state lines. *Id.* at 29, 34. As well, the court sentenced Appellant "in the aggravated range due to the heinous nature of his criminal enterprise using an addicted person [i.e., Hess] as a lab rat to engage in human testing of deadly drugs, which put her life at risk each time he did that." *Id.* at 34.

We find that the trial court provided ample reasons for imposing Appellant's sentence on corrupt organizations. First, the trial court indicated its review of the PSI and specific mitigating factors noted therein, including Appellant's age and health issues. *Id.* at 21-22. Where the court has the benefit of a PSI, we "presume that the sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." *Commonwealth v. Knox*, 165 A.3d 925, 930 (Pa. Super. 2017) (citation omitted). The trial court also addressed on the record each of the three general sentencing considerations found in Section 9721(b) of the Sentencing Code, "the protection of the public, the gravity of the offense as it relates to the impact

on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S. § 9721(b). Furthermore, as described above, the trial court indicated its awareness of the guideline sentence for corrupt organizations and offered specific reasons for deviating from the standard range and imposing an aggravated range sentence on this count. Therefore, we conclude the court adequately discharged its responsibility to state the reasons for its sentence. *Id.*; *Macias*, 968 A.2d at 777.

We likewise reject Appellant's claim that the trial court considered improper factors when sentencing him. Appellant argues that the trial court effectively double counted his prior record when it considered his past convictions despite the fact that they were already incorporated into the prior record score. When a factor is already incorporated into the sentencing guidelines, such as the defendant's prior record, a sentencing court may not count that factor a second time when arriving at a sentence. *Goggins*, 748 A.2d at 732. However, as this Court has explained, the sentencing court may consider a defendant's prior record in order to assess the scope of a defendant's problematic behavior as well as the potential for rehabilitation. *Commonwealth v. Messmer*, 863 A.2d 567, 573 (Pa. Super. 2004). Here, that is exactly what occurred: the trial court explicitly recognized that it could not simply double count Appellant's prior record and instead properly analyzed Appellant's long history of criminal behavior, including his drug-delivery offenses committed over a period of 16 years, in determining that he had no rehabilitative potential. N.T., 10/22/20, at 22-24, 30-31.

Appellant further claims that the trial court's finding that he lacked remorse contravened his right to remain silent. "[A] court may not consider a defendant's silence at sentencing as indicative of his failure to take responsibility for the crimes of which he was convicted." **Commonwealth v. Bowen**, 975 A.2d 1120, 1121 (Pa. Super. 2009). However, a sentencing court may consider a defendant's remorse or lack of contrition as evidenced by other factors beyond the defendant's silence. **Commonwealth v. Begley**, 780 A.2d 605, 643-44 (Pa. 2001); **Bowen**, 975 A.2d at 1121, 1127-28. In the instant matter, the trial court determined that Appellant lacked remorse—not from Appellant's decision not to testify or give a voluntary statement to the police—but instead based upon his multiple felony drug-distribution offenses, his decision to prize his own financial gain over the misery of others, and his decision to use Hess as a "lab rat" to test his product. N.T., 10/22/20, at 30-31. Therefore, the trial court's consideration of Appellant's lack of remorse did not infringe on his right to remain silent. **Bowen**, 975 A.2d at 1121, 1127-28.

Finally, Appellant contends that the trial court considered that Appellant transported drugs across state lines when that finding was contradicted by Hess's testimony that she did not see the drugs that Appellant brought back with him from New York City. N.T. (Trial), at 258, 379. However, this characterization of the record ignores the remainder of Hess's testimony that she accompanied Appellant on two or three trips to New York City, she understood the purpose of those trips to be for the purchase of opioids,

another male was present on one of the trips and they discussed the drugs they would purchase, and Hess acted as a drug tester on each one of these visits. *Id.* at 253-61. That Hess did not see the actual quantities of drugs that were purchased does not detract from the trial court's reasonable inference that the New York visits were for the purpose of purchasing heroin, fentanyl, or other opioids to bring back to York County.

In sum, we determine that the trial court adequately stated the reasons for its sentence and did not rely on improper factors. Moreover, in light of the trial court's consideration of the guidelines and the PSI, its opportunity to observe Appellant and its familiarity with his history and characteristics, and the court's proper application of the guidelines to this case, including its well-explained decision to sentence in the aggravated range on the corrupt organizations count, we do not find that the sentences imposed here were "clearly unreasonable." 42 Pa.C.S. § 9781(c)(2). Therefore, Appellant's discretionary sentencing issues lack merit, and we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 05/24/2022

- 23 -

IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA : CP-67-CR-0002239-2019
:
v. :
: POST-SENTENCE MOTIONS
JAMES ARTHUR CORBETT, :
Defendant :

COUNSEL OF RECORD:

Timothy J. Barker, Esquire         James R. Robinson, Esquire
Counsel for the Commonwealth   Counsel for the Defense

## OPINION IN SUPPORT OF ORDER

Defendant James A. Corbett, by and through his counsel, James R. Robinson,

Esquire, has filed post-sentence motions, which were docketed December 10, 2020. By a

separate order, of April 7, 2021, this Court has denied those motions. We now supply this

opinion in support of order.

### I.    Factual and Procedural Background

The Defendant was convicted of four counts of Possession with Intent to

Deliver (PWID), Corrupt Organizations, and Conspiracy to Corrupt Organizations by a jury at

the conclusion of trial on September 18, 2020. He was acquitted of Drug Delivery Resulting

in Death, Conspiracy to Drug Delivery Resulting in Death, one count of PWID, and one count

of Criminal Conspiracy to PWID.

At Defendant's trial Detective Clayton Glatfelter of the York City Police Department

testified to the procedures used to establish drug buys from the Defendant through the use of

1

two confidential informants. The detective testified regarding his unit's procedure for vetting an informant, "We would meet with a confidential source or potential confidential source, talk to them, judge the truthfulness, of their information that they were trying to give us, and ultimately the approval for them to serve as a confidential source would be approved through the DA's office." N.T. at 477. He then testified regarding the standard protocol used when having a confidential informant perform a controlled purchase from a suspected drug dealer:

> Typically when we do a controlled purchase of any type of narcotic with a confidential source, we would meet with the source beforehand. We would obtain all the information that we can about the person's intent to purchase the drugs from, phone numbers, descriptions, that type of thing, nickname, real names if they have them.
> From there we would search the informant or the confidential source, which is typically outer garments in wintertime. If they're wearing coats, i will take off their coats. I'll search all the pockets of their coats, nooks and crannies. Any loose clothing, shoes, look inside the shoes, have them turn their pockets out, run their waistband to make sure nothing falls out. Females, we'll have them, without showing me anything as I always predicate this, pull their bras out, shake their bras out, so that anything hidden within the band would fall out.

N.T. at 477-78. He further testified the informants are given a specific set of bills, tracked by the York City Police Department, with which to make the purchase, and that the informants are not allowed to have their own money on them when they make the purchase. N.T. 478-79. Regarding standard protocols, the detective also testified that when a controlled buy is set up, his task force will have multiple officers observing the location. N.T. at 479.

Detective Glatfelter then testified regarding two specific controlled purchases from the Defendant made using informant Kayleigh Jo Hess. N.T. at 480-526. On August 13, 2018, Hess was charged with illegally dealing a controlled substance. N.T. at 482. On August 16,

2

2018. Hess agreed to cooperate with the police in other related drug dealing investigations. N.T. at 486. She told the police about the people she purchased her drugs from, including a man who went by the name of "Sha," whom she identified as the Defendant at trial. N.T. at 486, 242. On August 28, 2018, after she had been released on bail, Hess agreed to work as a confidential informant for the York City Police to conduct a controlled purchase from the Defendant. N.T. at 488-489. Hess provided the police with the phone number she was using at the time to set up buys from the Defendant. She called the Defendant in the presence of Detective Glatfelter to set up a controlled purchase. N.T. at 490. The purchase was scheduled to take place behind a Turkey Hill convenience store near the 700 block of Avon Avenue in the City of York at around 7 p.m. N.T. at 491.

Detective Glatfelter testified that he had four other detectives performing surveillance in the vicinity of the Turkey Hill store. When asked why he required extra assistance on surveillance, he stated:

> It's completely not unusual for drug dealers to change locations on us where we'll be set up in one location and they'll call the informant and say, hey, meet me over here now. These are all things that I need contingency plans to help and extra people to help cover this if these things should occur. It's also to help follow people after the fact, after the deal is completed to assist me in locating stash houses and that type of thing.

N.T. at 492. Prior to conducting the controlled purchase, Detective Glatfelter performed a search of her person to ensure she was not bringing any extra drugs or contraband. He ensured that she only had the $70 in official recorded funds to make the purchase. N.T. at 493.

The detectives dropped Hess off in the vicinity of Maryland Avenue and Hartley Street

3

and told her to walk toward the area at which the deal was to be performed. N.T. at 496. The four other detectives were split into three teams and were patrolling the area conducting surveillance. Detective Glatfelter himself was conducting surveillance as well. This was done to ensure that Hess would be observed during the entire course of the controlled purchase. N.T. at 497-98. One of the observers noticed a tan Mercury Mountaineer vehicle turn into the alley, Avon Avenue, behind the Turkey Hill from Maryland Avenue. Hess walked to the passenger side of the Mercury Mountaineer, spoke with someone in the passenger seat, spoke with the occupant of that seat for a few seconds, and then walked back to Maryland Avenue. N.T. at 499-500. After this interaction the four detectives performing surveillance followed the Mountaineer while Detective Glatfelter recovered the confidential informant. N.T. at 501.

Hess had received a bundle of heroin, 10 bags, from the passenger of the Mountaineer. N.T. at 501. Detective Glatfelter performed another search of the informant to ensure she had not hidden extra drugs or money on her person. N.T. at 501. The other detectives trailed the Mercury Mountaineer, which traveled approximately a quarter of a mile away to a Sunoco gas station and parked at a gas pump. N.T. at 502. One of the detectives took pictures of the occupants of the vehicle at the gas station. One occupant, the passenger, was identified as James Corbett. N.T. at 503-04, 513. Detective Glatfelter identified the Defendant at trial as James Corbett, the same man who was photographed at the Sunoco station after exiting the Mercury Mountaineer that was involved in the controlled purchase. N.T. at 504. Detective Glatfelter also identified Alexis Weedon as an occupant of that vehicle. N.T. at 505. The

4

vehicle was registered to Alexis Weedon. N.T. at 506.

The second purchase was set up the following day, August 29, 2018. Hess again placed a call to the Defendant on her phone in front of the detectives. This time it went unanswered initially, but the Defendant called Hess back a few minutes later. This occurred around 2 p.m. N.T. at 511. The controlled purchase was set to take place at the McDonalds Restaurant in York City on South George Street. Detective Glatfelter testified that, at this point, he had identified Sha as James Corbett and had two detectives performing surveillance on two possible locations in which he lived, one of them being the home address of Alexis Weedon. N.T. at 512-13.

The Detective testified that he performed the same preliminary search of the informant prior to dropping her off to ensure she only had the $70 of official recorded funds necessary to make a purchase and no other contraband on her person. N.T. at 513-14. He dropped Hess off on the west side of the McDonalds and observed her while remaining in radio contact with his other detectives who were performing surveillance. N.T. at 514-16. The officers who were observing Alexis Weedon's residence noticed the Defendant get into a silver Nissan Sedan with North Carolina registration plates. The vehicle was a rental and the Defendant was the sole occupant. N.T. at 519-20. The Defendant drove to the McDonalds, picked up Hess, and then drove to a Wendy's Restaurant on 11th Avenue in North York. The detectives performing surveillance near the McDonalds followed the Defendant and Hess in the silver Nissan to Wendy's. N.T. at 521-22. Hess and the Defendant pulled into the Wendy's drive-thru at 2:50

5

p.m. and left the drive-thru at 2:54 p.m. N.T. at 522. The detectives followed the pair through town until they reached the vicinity of Pershing Avenue and Market Street. N.T. at 522-23. At this point the detectives lost visual contact with the Defendant and Hess for about five minutes. During these five minutes the Defendant had dropped off Hess in that area and Detective Glatfelter made phone contact with her. She was picked up in that vicinity at the end of this five-minute period. N.T. at 523.

When Detective Glatfelter picked up Hess he received the heroin that Hess had purchased from the Defendant and performed another search of her person to ensure she did not retain the money she had been given or have extra contraband. N.T. at 524. The detectives performing surveillance did locate the Defendant's silver Nissan and observed him re-entering Alex Weedon's residence. N.T. at 524-525.

Next Detective Glatfelter testified regarding a second confidential informant, Linda Johnson, who also performed a controlled purchase from the Defendant that same day, August 29, 2018.[1] Johnson contacted the York City Police about a possible heroin purchase she could make with a person she knew as "D". N.T. at 528. Johnson provided the police with a contact number for "D" which was the same number Hess had been using to set up controlled purchases with "Sha" on that day and the previous day. N.T. at 528. Johnson stated that the purchase would be taking place in the 100 block of West King Street in the City of York. Detective Glatfelter testified that he assigned officers to perform surveillance in that area during the

---

1 Linda Johnson died before trial.

6

purchase. N.T. at 529-30. Prior to the purchase, Detective Glatfelter performed a search of the informant in the same manner he had of Hess. N.T. at 530. Johnson had arranged to purchase $120 worth of heroin from "D" and the detective gave her official recorded funds to make the purchase. N.T. at 530. Detective Glatfelter testified that he posted himself in a vehicle in the vicinity where he could watch the informant as she met with "D" N.T. at 534.

At around 3:49 p.m. the same silver Nissan that had been involved in the Hess purchase earlier that day pulled up to the area where the controlled purchase was set to be made. N.T. at 535-537. The detectives took photographs and noted that "D" was the Defendant, James Corbett. N.T. at 537. The informant went to the passenger side of the vehicle, entered, and stayed in the vehicle for approximately three minutes. N.T. at 539-40. After that, both the informant and the Defendant got out of the vehicle and Defendant walked over to where Detective Glatfelter was performing surveillance. N.T. at 540-542. The Defendant spoke briefly with an unidentified person behind the vehicle the Detective was sitting in while observing the transaction. N.T. at 541-542. At this point in the trial Detective Glatfelter again identified the Defendant as the one he had seen that day selling heroin to Johnson. N.T. at 542. After talking to the person behind the Detective's vehicle, the Defendant went back into his own car and drove away. N.T. at 542. He was followed back to the same residence he had been seen at earlier that day, belonging to Alexis Weedon. N.T. at 542-43. The Defendant was video taped arriving back at that residence. N.T. at 543. After the Defendant left the 100 block of West King Street, Johnson went back to Detective Glatfelter's vehicle, got in, and was searched

7

again. She turned over a bundle of heroin, 10 bags, to the detective. N.T. at 544.

Detective Glatfelter next testified about his subsequent interactions with Kayleigh Jo Hess. She had stopped working with the police after performing the controlled purchase on August 29, 2018, and did not have any interactions with Detective Glatfelter until she was arrested for violating the conditions of her release. N.T. at 546-47. This occurred in early December of 2018. At that time Hess provided the police with information regarding the identity of *another individual that associated with the Defendant in his heroin selling enterprise*. N.T. at 547. She named the person as "C" or "Cease," whom the Defendant had told Hess was his nephew. N.T. at 547. Hess said that when she had attempted to purchase again from the Defendant, the Defendant had referred her to "C" to make a purchase as he had moved to Lancaster, Pennsylvania. N.T. at 547. The police first got wind of who "C" might be when a vehicle *registered to Alexis Weedon* was crashed by an individual named Curtis Ford. N.T. at 548. The police obtained photographs of Ford and presented one of them to Hess for identification in an eight-person line up. N.T. at 548-49. Detective Glatfelter testified to the formal procedure for creating and properly administering the lineup. N.T. at 549-553. Hess identified Curtis Ford as the person she knew as "C" or "Cease". N.T. at 552.

*Detective Glatfelter's testimony was corroborated by the testimony of two of the* officers who had performed surveillance during the controlled purchases and by the testimony of Kayleigh Jo Hess herself. Detective Vincent Monte first testified regarding his role in performing surveillance on the three controlled purchases set up by Detective Glatfelter. N.T.

8

at 572-580. Then he testified regarding a fourth controlled purchase between Linda Johnson and the Defendant that he set up himself as Detective Glatfelter was unavailable. On October 18, 2018, Johnson performed a controlled buy in the vicinity of the 100 block of West King Street. Prior to the purchase Detective Monte searched the informant to ensure she did not have any contraband on her and gave her another $120 of official recorded funds to purchase heroin from the Defendant. N.T. at 581-82. Other detectives were in the area performing surveillance. N.T. at 584. Johnson walked through a nearby parking lot to meet the Defendant and make the purchase. N.T. at 584-85. Johnson and the Defendant, who was wearing a grey hoodie sweatshirt with the hood up,[2] walked through the lot toward Pershing Avenue. N.T. at 585. Detective Monte testified that he was able to keep constant surveillance of both of them throughout the transaction. N.T. at 586. Eventually Johnson and the Defendant met at a parked BMW, got into the BMW together, and then Johnson left the BMW to walk back to the 100 block of West King Street where she was picked up by Detective Monte. N.T. at 586. Detective Monte performed another search of the informant and recovered a quantity of heroin that she had purchased from the Defendant. N.T. at 586-87. The surveillance team followed the BMW away from the purchase site and identified the Defendant as the one who had made the purchase in the grey hoodie and identified the driver of the vehicle as Robert Brown of Lancaster. N.T. at 589-590. Detective Monte made an in-court identification of James Corbett as the same man

---

2 Officers were able to identify him shortly after the transaction when they followed him away from the purchase site. N.T. at 589.

9

who wore a grey hooded-sweatshirt during the controlled purchase. N.T. at 590.

Detective Christopher Ford was the last witness to testify at trial and he detailed his role in interrogating regarding Alan Bocchini's death and recruiting Kayleigh Jo Hess as an informant in this case. N.T. at 605-18.

Hess testified before Detective Glatfelter and the other detectives at trial and her testimony aligned with the detective's testimony.[3] Hess testified that she worked with the police after she was released from jail on August 27, 2018. N.T. at 301. She recounted the events of the first heroin buy from the Defendant that took place on August 28, 2018. N.T. at 302-310. She also testified regarding the events of the second purchase that took place the next day on August 29, 2018. N.T. at 310-16. Both accounts matched up with the one testified to at length by Detective Glatfelter. Hess then testified regarding her subsequent relapse and eventual continued cooperation with the York City Police in this matter. N.T. at 316-318. She testified to the Defendant's referral to a person named "Cease" from whom she purchased heroin. N.T. at 320-322. She then testified to the identification process the Detectives put her through regarding "Cease" when she resumed working with the police in December of 2018. N.T. at 323-28.

Hess also testified to her role within Defendant's drug-vending enterprise. Hess

---

3 The majority of Hess's testimony focused on the death of Alan Bocchini Jr., how she came to know the Defendant, and the Defendant's role in selling her the drugs that ultimately killed Mr. Bocchini. N.T. at 233-300. However, because the Defendant was acquitted of those charges, this Court will solely address her testimony regarding the controlled purchases she performed for the York City Police. This Court also notes Hess positively identified the Defendant at trial. N.T. at 242.

10

testified that Defendant was obtaining drugs from New York. N.T. at 253. Hess knew this because she accompanied Defendant to New York, on multiple occasions, to obtain heroin. N.T. at 253-54. Hess was to be Defendant's drug tester to determine whether he should bring the drugs from New York to Pennsylvania. N.T. at 254-55. A black male, from Baltimore, accompanied Defendant and Hess on one trip and Hess believed Defendant and this individual were discussing what was to be purchased. N.T. at 255-56. In New York, Defendant directed Hess' actions and brought her drugs to sample. N.T. at 257-58. Hess ended her direct examination with a long recounting of the favorable deal, with the Commonwealth, which she received in exchange for the testimony she gave against the Defendant at trial. N.T. at 328-334.

## II.    **Omnibus Pretrial Motions**

### A. Sufficiency of Evidence

Defendant's first motion is that there was insufficient evidence presented at trial to convict Defendant of four counts of possession with intent to distribute—delivery, corrupt organizations, and conspiracy to corrupt organizations. For the following reasons, we disagree.

*Ab initio*, due to the overlapping factual support offered for Defendant's sufficiency of the evidence and weight of the evidence challenges, the Commonwealth addressed them simultaneously. Commonwealth's Memorandum of Law in Opposition to Defendant's Post-Sentence Motion/Motion to Reconsider Sentence, at 1. Though we make no judgment of this

11

approach, with caution towards blurring the line betwixt these disparate legal challenges, we dispense with them separately. Though, we agree with the Commonwealth's approach of addressing Defendant's sufficiency argument first. *Id.*

We begin our analysis by noting that while considering Defendant's claims regarding sufficiency of the evidence, this Court takes note of the inconsistency of these challenges vis-à-vis Defendant's later weight of the evidence challenge. For, "'[a] true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict' but questions which evidence is to be believed." *Commonwealth v. Galindes*, 786 A.2d 1004, 1013 (Pa. Super. Ct. 2001) (quoting *Armbruster v. Horowitz*, 744 A.2d 285, 286 (Pa. Super. Ct. 1999)). Potential inconsistency aside, in *Commonwealth v. Fabian*, the Superior Court laid out their standard of review for sufficiency of the evidence challenges as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [finder] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

60 A.3d 146, 150-51 (Pa. Super. Ct. 2013) (quoting *Commonwealth v. Jones*, 886 A.2d 689, 704 (Pa. Super. Ct. 2005)); Accord *Commonwealth v. Melvin*, 103 A.3d 1, 39 (Pa. Super. Ct. 2014). This stated, we turn to apply this law to each of the charges.

### 1. *Delivery Charges*

Possession with intent to distribute—delivery (hereinafter: delivery), is defined as follows:

> **(a)** The following acts and the causing thereof within the Commonwealth are hereby prohibited:
>
> **(30)** Except as authorized by this act, the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under this act, or a practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance.

35 P.S. § 780-113(a)(30). As there was no evidence that Defendant was a person registered under the act, the Commonwealth needed to present evidence that Defendant delivered a controlled substance. The nature of the substances were stipulated to, at the time of trial, as being controlled substances. (N.T., 9/14/20, at 596-600.) With this stipulation, the Commonwealth only needed to demonstrate that Defendant delivered these controlled substances. Delivery is defined as follows:

> "DELIVER" or "DELIVERY" means the actual, constructive, or attempted transfer from one person to another of a controlled substance, other drug, device or cosmetic whether or not there is an agency relationship.

35 P.S. § 780-102.

Before presenting the evidence of delivery, we note that Defendant listed numerous

13

supposed failings of the evidence, including, *inter alia*, that no officers observed the actual transactions and that no fingerprint or DNA evidence connected Defendant to the deliveries. Post Sentence Motions/Motion to Reconsider Sentence, at 8 (citations omitted). These countervailing pieces of evidence, arguably, go more towards the *weight* of the evidence and not the sufficiency. However, to the extent that they are asserted to demonstrate that the evidence was so weak and inconclusive that no probability of fact could be drawn, *Fabian, supra*, we disagree.

Multiple detectives ran typical buy-walk operations in which confidential informants, bearing all of the usual baggage attendant to informants, were searched and then surveilled as they conducted drug transactions with Defendant. The informants left the custody of officers with official funds and sans drugs, met with Defendant, and returned to custody with drugs. With one limited exception, these transactions occurred under constant surveillance and on *multiple* occasions in which officers and the informants identified Defendant. There was a surfeit of circumstantial evidence, which, per *Fabian, supra*, is sufficient, of four deliveries of controlled substances by Defendant.

We find support for our conclusion in the factually similar case of *Commonwealth v. Ellison*, 213 A.3d 312 (Pa. Super. Ct. 2019), highlighted by the Commonwealth. Commonwealth's Memorandum of Law in Opposition to Defendant's Post-Sentence Motion/Motion to reconsider Sentence, at 4. Without expounding unnecessarily upon the Commonwealth's excellent summation of that case, the *Ellison* court rejected the notion that

14

a defendant cannot be convicted of PWID—delivery where it must be inferred that a defendant delivered drugs and accepted official funds. *Id.*, at 319-321. Moreover, as the Commonwealth notes, one of the two confidential informants utilized in this case was presented, which was not the case in *Ellison*. Commonwealth's Memorandum of Law in Opposition to Defendant's Post-Sentence Motion/Motion to Reconsider Sentence, at 5. Thus, there was an additional piece of evidence presented against Defendant that was not presented in the legally sufficient case of *Ellison*. There was more than sufficient evidence presented to sustain Defendant's convictions for PWID—delivery.

  2. *Corrupt Organizations and Conspiracy to Commit Corrupt Organizations*

Defendant was convicted of corrupt organizations and conspiracy to commit corrupt organizations, which, merged for sentencing purposes. Thus, we dispense with them simultaneously.

Corrupt organizations is defined, in relevant part, as follows:

> **(3)** It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

> **(4)** It shall be unlawful for any person to conspire to violate any of the provisions of paragraphs (1), (2) or (3) of this subsection.

18 Pa.C.S. § 911(b)(3), (4). Some definitions are in order.

An "enterprise" is defined as follows:

> "Enterprise" means any individual, partnership, corporation, associate or other legal entity, and any union or group of individuals associated in fact although not a legal entity, engaged in commerce and includes legitimate as well as

15

illegitimate entities and governmental entities.

18 Pa.C.S. § 911(h)(3). "Racketeering activity," in relevant parts, is:

> An offense indictable under section 13 of the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act (relating to the sale an dispensing of narcotic drugs)[, or . . . a] conspiracy to commit any of the offenses set forth in subparagraph (i), (ii) and (v).

18 Pa.C.S. § 911(h)(1)(ii), (iii). "'Pattern of racketeering activity' refers to a course of conduct requiring two or more acts of racketeering activity one of which occurred after the effective date of this section." 18 Pa.C.S. § 911(h)(4).

In *Commonwealth v. Dennis*, our Superior Court stated the following about enterprises:

> Although Pennsylvania's corrupt organizations statute is based on the federal corrupt organizations statute, federal case law in this area is instructive, but not controlling. *Commonwealth v. Taraschi*, 475 A.2d 744 (1984). Nevertheless, in *United States v. Turkette*, 452 U.S. 576 (1981, the United States Supreme Court held that an enterprise may be established if there is (1) "evidence of an ongoing organization," (2) evidence that the various associates function as a formal or "continuing unit," and (3) evidence that the enterprise has an existence "separate and apart from the pattern of activity in which it engages."

618 A.2d 972, 975 (Pa. Super. Ct. 1992). The *Dennis* Court also included the following quote regarding the third element of *Turkette*:

> As we understand this last requirement, it is not necessary to show that the enterprise has some function wholly unrelated to the racketeering activity, but rather that it has an existence beyond that which is necessary to commit each of the acts charged as predicate racketeering offenses. The function of overseeing and coordinating the commission of several different predicate offenses and other activities on an ongoing basis is adequate to satisfy the separate existence requirement.

16

*Id.*, at 975-76 (quoting *United States v. Riccobene*, 709 F.2d 214, 223-24 (3d Cir. 1983), *cert. den., sub nom. Ciancaglini v. U.S.*, 464 U.S. 849 (1983)).

In the case *sub judice*, the record is replete with evidence that there was a criminal enterprise. Alexis Weedon was present during Ms. Hess' first controlled-buy with Defendant. Defendant repeatedly departed from and returned to Weedon's home during these deals. Defendant met and spoke with an unknown subject immediately following a controlled-buy before returning to his own vehicle. Ms. Hess informed investigators that, when she had attempted to purchase drugs, Defendant had relocated to Lancaster and had, therefore, referred her to someone he declared was a nephew to continue illicit drug commerce. That nephew was only identified after he was involved in a car accident while utilizing a vehicle registered to Weedon. During one of Ms. Johnson's controlled buys with Defendant, they met at a BMW driven by a Robert Brown *of Lancaster*, which buttressed Ms. Hess' information. Ms. Hess was involved in interstate drug purchasing trips to New York, arranged by Defendant, where he transported her across state lines, that included, on at least one occasion, an individual from Baltimore. Defendant directed Hess' actions as his drug-tester during these trips. This all fits the definitions of an enterprise that are laid out in *Dennis, supra*.

There was an ongoing organization in that Defendant utilized the same silver Nissan to depart Weedon's residence *twice* on the same day to deal drugs to *two different informants*. There was a formal and continuing unit in that Hess was transported multiple

17

times by Defendant, to New York, to sample drugs for him. Weedon's name crops up as a driver, host of the operation from her home, and supplier of a vehicle to Ford, who Hess connects to Defendant's operation. Finally, the enterprise existed beyond a singular predicate crime. The enterprise facilitated multiple illicit drug deals, multiple interstate buying trips, and it facilitated drug crimes across at least two counties in this Commonwealth.

Continuing on to the elements of racketeering activity and pattern of racketeering activity, there is no question but that Ms. Hess' description of the buying trips to New York in conjunction with the controlled-buys involving Hess and Johnson satisfy these definitions. Drug purchases and sales are indictable offenses under The Controlled Substance, Drug, Device and Cosmetic Act. Insofar as conspiracy, both Hess and Weedon, if not others, *clearly* agreed to ongoing roles within Defendant's drug-vending operation. Overt acts included Hess accompanying Defendant on buying trips and Weedon driving Defendant to a controlled-buy. The pattern of racketeering activity was satisfied by evidence presented that there were multiple controlled-buys.

Defendant participated in and directed the activities of an enterprise that committed the racketeering activity of trafficking in and distributing illicit drugs. There was a pattern of racketeering activity in that multiple drug sales were facilitated by that enterprise. There was a conspiracy including, very clearly, Hess and Weedon—along with evidence of others' involvement—to violate The Controlled Substance, Drug, Device and Cosmetic Act. Evidence of each element was adduced.

18

The Court has reviewed the litany of facts and characterizations of facts submitted by Defendant to support his motions (e.g. that Hess never saw Defendant bring heroin back from another state or location to York and that the searches of the informants were not thorough enough). Post Sentence Motions/Motion to Reconsider Sentence, at 9-10. As we stated regarding an earlier portion of the sufficiency motion, these facts are better directed towards a weight of the evidence challenge; however, considered in light of this sufficiency challenge, we cannot state that the evidence proffered by the Commonwealth was so weak or inconclusive that no probability of fact could be drawn from the combined circumstances. The Commonwealth did not have to preclude every possibility of innocence. Rather, the Commonwealth had to supply evidence of every element of the offenses. They did so.

Viewing the evidence in the light most favorable to the verdict-winning Commonwealth, there was more than sufficient evidence presented to support Defendant's convictions for corrupt organizations and conspiracy to commit corrupt organizations. This motion is denied.

B. Weight of the Evidence

Defendant's next post-sentence motion for relief is that the verdicts were against the weight of the evidence. We disagree.

Allegations that a verdict is against the weight of the evidence are decided based upon the discretion of the trial court. *Commonwealth v. Chine*, 40 A.3d 1239, 1243 (Pa. Super. Ct. 2012) (citing *Commonwealth v. Dupre*, 866 A.2d 1089, 1101 (Pa. Super. Ct. 2005)). The trier

19

of fact, "is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Ramtahal*, 33 A.3d 602, 609 (Pa. 2011). Moreover, the trial court should not disturb a jury's verdict unless the verdict is "so contrary to the evidence as to shock one's sense of justice." *Id.* What "shocks one's sense of justice" is defined as follows:

> When the figure of the Justice totters on her pedestal, or when the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience.

*Commonwealth v. Davidson*, 860 A.2d 575, 581 (Pa. Super. Ct. 2004) (internal citations and quotations omitted). Further, "unless the evidence is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, these types of claims are not cognizable on appellate review." *Commonwealth v. Gibbs*, 981 A.2d 274, 282 (Pa. Super. Ct. 2009) (citing *Commonwealth v. Rossetti*, 863 A.2d 1185, 1191 (Pa. Super. Ct. 2004)). Appellate review will not overrule a trial court's determination as to weight of the evidence unless "the facts and inferences of record disclose a palpable abuse of discretion." *Id.* To this end, "the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings." *Id.*

There are pieces of evidence which do not strengthen the Commonwealth's case; however, the test is not whether there is any evidence that goes against the Commonwealth's assertions. Rather, this Court is to examine whether the verdict was "so contrary to the evidence as to shock one's sense of justice." In contrast, the evidence firmly supported that

20

the Defendant was a chronic and sophisticated drug dealer, for profit, who preyed upon addicts both as customers and as tools to perpetuate his criminal enterprise. This Court was not shocked in the least. The figure of Justice is still firmly fixed atop her pedestal. No relief is granted on this claim.

### C. Sentence Consideration

Defendant's next series of motions alleges that this Court abused its discretion in sentencing him. For the reasons cited *infra*, we disagree.

Though we will address each of Defendant's challenges in turn, there is merit in stating the basic law regarding discretion in sentencing and the relevant facts. We begin with the law.

In *Commonwealth v. Foust*, the Superior Court quoted 42 Pa.C.S.A. § 9721(b) for the proposition that

> the sentence imposed should call for confinement that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant.

180 A.3d 416, 439 (Pa. Super. Ct. 2018). And, "'[t]he [trial] court is not required to parrot the words of the Sentencing Code, stating every factor that must be considered under Section 9721(b), however, the record as a whole must reflect due consideration by the court of the statutory considerations at the time of sentencing.'" *Id.* (quoting *Commonwealth v. Bullock*, 170 A.3d 1109, 1126 (Pa. Super. Ct. 2017) (internal alterations, quotation marks, and citations omitted in original). The basic law stated, we recite the considerations and findings

21

weighed by this Court at sentencing.

At the start of the sentencing proceeding, the Commonwealth acknowledged that, with Defendant having been acquitted of those charges connected to the death of Alan Bocchini, the Court could not consider Mr. Bocchini's demise in fashioning Defendant's sentence. (Notes of Testimony, 10/22/20, at 4-5.) This Court agreed. *Id.*

The Commonwealth explicitly highlighted that Defendant was not a young adult with capacity to change. *Id.*, at 10. He committed these crimes at 47 and 48 years of age and, at the time of sentencing, was going on 50 years old. *Id.* Defendant claimed not to have any addiction issues. *Id.*

Upon beginning our sentencing order, this Court stated the following:

> As I noted, I've considered the PSI and its recommendations. I've considered the arguments of counsel, the statements of the Defendant, considered all of the evidence presented in the case and the surrounding circumstances, considered the Defendant's age and health issues, considered numerous other factors that I'll go into in more detail in my sentencing decision.

*Id.*, at 22. Defendant's prior record at sentencing was a 5. *Id.* We acknowledged that the conduct leading to that prior record score could not be double counted; however, we professed that it could be addressed for relevant factors beyond the prior record score. *Id.*, at 22. Specifically, this Court was looking at the prior record score for evidence of Defendant's rehabilitative potential, or lack thereof. *Id.*, at 22-23. This Court wished to know if Defendant's prior record score was owed, at all, to repeated behavior that would indicate a poor rehabilitative potential. *Id.*, at 23. And, we found Defendant had two prior drug

delivery-type offenses, which concerned this Court. *Id.* Moreover, though we acknowledged that it was "not a constant parade of charges," Defendant had fairly regular ongoing criminal behavior associated with drugs. *Id.*, at 23-24.

As we stated in great detail, Defendant's victimization of people was of concern. *Id.*, at 24. Defendant had prior convictions for robbery of the first degree, tampering with a witness to prevent testimony, and criminal possession of a weapon. *Id.* We noted that Defendant victimizes his drug delivery customers. *Id.*, at 24-25.

While acknowledging that he is not individually responsible for the full impact, Defendant's impact on society has been great because he has trafficked in highly addictive and potentially deadly drugs. *Id.*, at 25. In fact, we acknowledged that on the spectrum of bad actors dealing drugs, Defendant is somewhere between those feeding their own habit and the true professionals who make billions of dollars at "legitimate" drug companies. *Id.*, at 28. This Court, at great length, indicated the sorry history that has created a market for Defendant's wares. *Id.*, at 25-28. We tied Defendant to this by acknowledging that he is not responsible for creating this market but that, as a predator, he identified the opportunity that this marketplace of misery offered and he availed himself of it. *Id.*, at 28.

We highlighted that Defendant has no mental health issues. *Id.* We noted that Defendant had no addiction issues driving his conduct. *Id.* Thus, we identified Defendant as a mid-level drug dealer, motivated by money, with *no care* for other human beings. *Id.*, at 29.

Referring to the danger posed by Defendant and his lack of rehabilitative potential,

23

we sentenced in the aggravated range on criminal organizations. *Id.* We stated how Defendant trafficked drugs across state and county lines. *Id.* We kept coming back to Defendant's victimization of others and his usage of Kayleigh Jo Hess as a lab rat to test his drugs. *Id.*, at 29-30. As to the dealing offenses, we stated our belief that as soon as Defendant is released, because he has no rehabilitative potential, Defendant is going to return to dealing drugs. *Id.*, at 31. As such, "[t]o protect society, he needs to be sentenced for a lengthy period because his conduct and ongoing conduct has reflected that he is irredeemable." *Id.*, at 32. As evidence of Defendant's continued recalcitrance, we noted that, while awaiting sentencing, he received write-ups at York County Prison for fighting and for refusing an order. *Id.*

Summing up much of what we had already recounted, this Court stated the following:

> Taking all of these matters into consideration, considering the Defendant's background, his criminal disposition, his character, lack of remorse, and rehabilitation, the fact that he was at the center of a criminal organization doing this, the Defendant is going to be sentenced to consecutive sentences.
>
> There is going to be no group discount to reward Mr. Corbett for the volume of misconduct he was engaged in. That would send the wrong message to Mr. Corbett. It would send the wrong message to others in society who are engaged in criminal enterprises. It would send a message that, well, if you do more business, you're just going to end up getting a concurrent sentence any way, so you might as well sell as much as you can.
>
> This Judge wants to send the opposite message, which is in appropriate cases, such as Mr. Corbett's, if you're drawing in more victims, spreading more misery, you're going to pay for it, and you're going to pay for each occasion when you have a character such as the Defendant has.

*Id.*, at 32-33. We believe that we thoroughly stated our reasons for sentencing Defendant in the fashion that we did and that, per *Foust, supra*, in consideration of protecting the public,

24

the gravity of the offense, and Defendant's rehabilitative needs. Defendant was sentenced appropriately. With this stated, we turn to the specific allegations of error and abuse.

1. *Warranting of Concurrent Sentences*

Defendant opines that, because the police possessed sufficient evidence to effectuate an arrest after the first controlled-buy operation, his PWID—delivery charges should run concurrently. Defendant believes that this Court committed error in imposing consecutive sentences on the delivery charges. For the following reasons, we disagree.

To begin, though defense counsel specifically denied invoking sentencing entrapment in advocating for concurrent sentences, (N.T., 10/22/20, at 18.), we believe this complaint sounds in that doctrine. We therefore analyze it through that prism.

In *Commonwealth v. Paul*, the Superior Court stated that "[s]entencing manipulation occurs when 'a defendant, although predisposed to commit a minor or lesser offense, is entrapped in committing *a greater offense subject to greater punishment.*'" 925 A.2d 825, 830 (Pa. Super. Ct. 2007) (quoting *Commonwealth v. Petzold*, 701 A.2d 1363, 1365 (Pa. Super. Ct. 1997)) (emphasis added). Each of the deliveries in question was for *less* than a gram, which is to say that Defendant was not entrapped into committing a greater offense. Rather, Defendant simply was engaged in distributing the smallest of considered amounts of a lethal substance and less than the threshold that begins to increase punishments.

In addition to the foregoing, in approving of the notion of sentencing entrapment as a cognizable legal concept in our Commonwealth, the Superior Court has stated the following:

25

With our acceptance of the premise underlying sentencing entrapment and manipulation, we adopt the standard typically applied in such cases, namely, the existence of "outrageous government conduct" or "extraordinary government misconduct" which is designed to and results in an increased sentence for the convicted defendant. This standard presents a heavy burden for the defendant seeking a sentence reduction. Simply put, sentencing entrapment/manipulation is difficult to prove; it is not established "simply by showing that the idea originated with the government or that the conduct was encouraged by it, . . . **or that the crime was prolonged beyond the first criminal act** . . . or exceeded in degree or kind what the defendant had done before.

*Commonwealth v. Petzold*, 701 A.2d 1363, 1366-1367 (Pa. Super. Ct. 1997) (Quoting *United States v. Montoya*, 62 F.3d 1, 3 (1st Cir. 1995)). Defendant has not established outrageous government conduct designed to increase his sentence. The fact that multiple controlled buys occurred helped to establish that there was a criminal enterprise, which we will address in relation to a later motion.

Defendant's hefty sentence did not simply flow from the fact that there were four deliveries. Rather, as this Court stated at sentencing, the tone and tenor of Defendant's sentencing was to remove a dangerous *repeat* victimizer of vulnerable persons from the streets, because Defendant's record indicated that he would continue to deal poison to his fellow citizens. No relief is warranted.

2. *Rectitude of Offense Gravity Score For Counts 4, 5, 6, and 10*

Defendant avers that this Court erred in assessing an offense gravity score of 9 instead of an 8 where there was nothing of record that Defendant had any prior convictions for PWID or delivery of Fentanyl. We disagree.

26

To begin, we acknowledge the following:

Amendment 4 of the 7th Edition Sentencing Guidelines were effective January 1, 2018 and apply to all offenses committed on or after that date. The Supplement to Amendment 4 was effective June 1, 2018 and applies to violations of 35 P.S. § 780-113(a)(14) and (30) involving fentanyl and its derivatives and analogues. Amendment 5 will be effective January 1, 2020 and apply to offenses committed on or after that date.

. . .

The Commission **decreased** the OGS assignment for the smallest amount of fentanyl (<1 gram). The offense gravity score was reduced from OGS 9 to OGS 8 for delivery by practitioner and for possession with intent to deliver (35 780-113(a)(14) and (30)). The Supplement to Amendment 4 Sentencing Guidelines was effective June 1, 2018, and the Commission considered sentences imposed since then.

49 Pa.Bull. 5110 (emphasis added). The drug deliveries in question occurred from August through October 2018. Bearing this in mind, we continue.

If the correct OGS was an 8 then, with a prior record score (hereinafter: PRS) of 5, the sentencing matrix calls for a standard range of 27-33 months with the aggravated range, with the addition of 9 months, being 42 months. 204 Pa. Code § 303.16(a). And 35 P.S. § 780-115 states:

(a) Any person convicted of a second or subsequent offense under clause (3) of subsection (a) of section 13 of this act or of a similar offense under any statute of the United States or of any state may be imprisoned for a term up to twice the term otherwise authorized, fined an amount up to twice that otherwise authorized, or both.

(b) For purposes of this section, an offense is considered a second or subsequent offense, if, prior to the commission of the second offense, the offender has at any time been convicted under clause (30) of subsection (a) of section 13 of this act or of a similar offense under any statute of the United

27

States or of any state relating to controlled substances.

Thus, with Defendant's prior drug delivery convictions, he could have been sentenced up to 84 months *under the guidelines*.

Admittedly, at the time of sentencing, this Court stated that Defendant's OGS was a 9 for each of the relevant counts. If the OGS of 9 was correct then the sentencing guidelines called for a standard range of 48 to 60 months, with an aggravated range of up to 72 months. See 204 Pa. Code § 303.16(a). Per 35 P.S. § 780-115, Defendant could have been sentenced up to 144 months *under the guidelines*.

We have emphasized *under the guidelines* in our preceding explication because for all of the *numerous* reasons laid out by this Court at sentencing, this Defendant deserved a sentence outside of the guidelines because of the extreme danger he poses to society. His usage of a co-conspirator as a drug tester evidences a disregard for human life above and beyond the depraved nature of drug dealers who show no concern for their clientele. Defendant does not even care for those who are ostensibly in league with him. As we said at sentencing, he displays no sense of empathy. Defendant's age and prior record show that he cannot be rehabilitated. The best that this Court can do is to make society safe from him. We stated all of this, and more, at sentencing and, because of those reasons, a change in the prior record score would not change the appropriate sentence under this Court's reasoning. This is not a disregard of the sentencing guidelines. It is a recognition that Defendant's particular conduct in this case merits consideration of the guidelines, and to then depart from them, to

28

attain the reasons and goals laid out in detail by this Court—protection of society, deterrence, and punishment.

As was noted by the Commonwealth, "a sentence outside of the guidelines shall be upheld so long as the sentence is not unreasonable." Commonwealth's Memorandum of Law in Opposition to Defendant's Post-Sentence Motion/Motion to Reconsider Sentence, at 8 (citing 42 Pa.C.S. § 9781(c)). For the reasons stated at sentencing and reiterated here, we believe our sentence was reasonable. This motion is denied.

### 3. Cited Factors Already Included in Prior Record Score

Defendant argues that this Court abused its discretion in sentencing him in the aggravated range in consideration of factors (prior record, prior periods of incarceration) that are already included in the computation of Defendant's prior record score. We disagree.

The Commonwealth has cited to *Commonwealth v. Peck*, 202 A.3d 739, 749 (Pa. Super. Ct. 2019). Commonwealth's Memorandum of Law in Opposition to Defendant's Post-Sentence Motion/Motion to Reconsider Sentence, at 11. *Peck* was overturned on other grounds by our Supreme Court, but it nicely summates relevant principles from *Commonwealth v. Messmer* as to this point:

> The court's references to Appellant's prior convictions for drug offenses were proper, as the specific nature of those offenses was relevant to the court's consideration of Appellant's rehabilitative potential. *See Messmer*, 863 A.2d at 573 (noting that although the prior record score accounted for the defendant's prior driving-under-the-influence convictions, the score did not reflect the defendant['s] "complete absence of regard for the law" and the need to protect the public). Similarly, the court's reference to deterrence was adequately related to the protection of the public in light of Appellant's poor

29

rehabilitative potential. Accordingly, we see no merit to Appellant's claim that the trial court double counted factors already included in the sentencing guidelines. *See id.*

Therefore, following a review of the record, and mindful of our standard of review, we see no reason to disturb the trial court's decision to impose a maximum sentence.

*Id.*

In the present case, Defendant's prior record was referenced in regards to his complete lack of rehabilitative potential. Despite those earlier convictions, Defendant was running an intercounty and interstate drug vending operation. We combined this with his being well into middle age and *still* engaging in drug offenses and Defendant's utter lack of empathy for his customers and Kayleigh Jo Hess. As we stated at sentencing, Defendant treated Ms. Hess as a lab rat upon whom he could test deadly drugs prior to buying them in New York City and importing them to Pennsylvania. Treating humans as chattel property to use and abuse for profit deviates so far from normal drug-dealing behavior that this Court was compelled to levy consecutive sentences to protect the public from a defendant with no rehabilitative potential. This motion is denied.

4. *Sufficiency of Reasons Stated for Deviation from the Guideline Range*

Defendant next submits that this Court stated insufficient reasons for deviating from the guideline range. We disagree.

This opinion has already grown overlong. We believe the record of the sentencing transcript, as repeatedly explored in this opinion, sufficiently identified reasons why

30

Defendant's outrageous conduct warranted departure from the standard guidelines on sentencing. This motion is denied.

### 5. *Consecutive Sentences*

Defendant avers that this Court abused its discretion in imposing consecutive sentences. We disagree.

The Commonwealth's brief notes this Court's power to sentence a defendant to consecutive sentences. Commonwealth's Memorandum of Law in Opposition to Defendant's Post-Sentence Motion/Motion to Reconsider Sentence, at 10 (citing *Commonwealth v. Johnson-Daniels*, 167 A.3d 17, 28 (Pa. Super. Ct. 2017)). In *Johnson-Daniels*, the Superior Court stated the following:

> With respect to the imposition of consecutive versus concurrent sentences, "[l]ong standing precedent of this Court recognizes that 42 Pa.C.S. section 9721 affords the sentencing court discretion to impose its sentence concurrently or consecutively to other sentences being imposed at the same time or to sentences already imposed." *Commonwealth v. Gonzalez-Dejusus*, 994 A.2d 595, 598 (Pa. Super. Ct. 2010).

167 A.3d, at 28. Defendants are not entitled to a "volume discount" for their crimes. *Id.* (citing *Commonwealth v. Hoag*, 665 A.2d 1212, 1214 (pa. Super. Ct. 1995)).

Without belaboring the point, we believe we have made it clear, during sentencing and throughout this opinion, that it was the intention of this Court to sentence Defendant in such a manner as to incapacitate him from harming the community for a long period of time. Though we are repeating ourselves, Defendant lacks empathy and his age and record evidence that he has no rehabilitative potential. Imposing consecutive sentences allowed this

31

Court to accomplish the goal of safeguarding the community. As such, we deny relief on this motion.

### 6. *Propriety of Considering Prior Record*

Defendant claims that this Court improperly considered his prior record in spite of it already being incorporated into his prior record score. We disagree.

This Court has already addressed a very similar, if not identical, claim above in the subsection titled: *Cited Factors Already Included in Prior Record Score*. We would refer to the arguments therein in refutation of this claim, which we deny.

### 7. *Lack of Remorse*

Defendant submits that this Court improperly considered his lack of remorse in violation of his right to remain silent. We disagree.

The Commonwealth has responded with a quote from *Commonwealth v. Grays*, "'it is undoubtedly appropriate for a trial court to consider defendant's lack of remorse as a factor at sentencing, provided that it is specifically considered in relation to protection of the public, the gravity of the offense, and the defendant's rehabilitative needs.'" Commonwealth's Memorandum of Law in Opposition to Defendant's Post-Sentence Motion/Motion to Reconsider Sentence, at 9 (quoting *Commonwealth v. Grays*, 167 A.3d 793, 817 (Pa. Super. Ct. 2017) (quoting *Commonwealth v. Bowen*, 975 A.2d 1120, 1125 (Pa. Super. Ct. 2009))). Our sentencing pronouncement, on this point, directly tracks this standard.

Referring to Defendant's usage of Kayleigh Jo Hess as a lab rat that he could test

drugs on, which imperiled her, we found that Defendant had no rehabilitative potential. (Notes of Testimony, 10/22/20, at 30.) In terms of gravity of the offense, we noted Defendant's significant role in "an economy that has brought so much misery and harm to York County, and he sold this misery solely for personal profit and because he was unwilling to do honest work." *Id.*, at 31. And as far as protecting the public, we referred to the harm that the drug trade has caused in York and to the fact that we are sure Defendant will return to peddling that poison as soon as he is released. *Id.* Per *Grays, supra,* we did not improperly consider Defendant's lack of remorse. This motion is denied.

### 8. *Transport of Drugs Across State Lines*

Defendant argues this Court improperly considered that Defendant transported drugs across state lines when Kayleigh Jo Hess testified that she did not see Defendant bring drugs back across state lines.

Defendant ignores that the main thrust of this Court's pronouncement about drugs being transported was that the Defendant took Kayleigh Jo Hess across state lines to use her as a lab rat to test drugs without any care for her safety. (Notes of Testimony, 10/22/20, at 29-30.) It also ignores that a jury found Defendant guilty of conspiracy to commit corrupt organizations. As stated above, Ms. Hess testified to her role as Defendant's drug-tester. The fact that she did not state that she saw drugs transported—when she easily could have done so—only increased her credibility. When a member of a conspiracy testified credibly that they were transported across state lines to test drugs to be imported into our Commonwealth,

33

the Court could easily infer that drugs were in fact transported. It would be the height of cognitive dissonance to believe Ms. Hess that she was taken by Defendant, *on multiple occasions*, to New York to sample drugs for import into Pennsylvania, but to refuse to infer that the importation occurred. Again, the mention of interstate drug trafficking was more an aside to get to the damning fact that Defendant callously preyed upon the human frailty of another human being in order to utilize her as a lab rat. This motion is meritless and is rejected.

### 9. *Period of Crime*

Defendant argues that this Court erred when it imposed consecutive sentences despite Defendant's offenses occurring over a short period of time. We disagree.

To begin, the crimes were not committed over that short a period of time. The controlled buys occurred over a period of time that spanned late August into October.

As we already stated in addressing an earlier contention, defendants are not entitled to a "volume discount" for their crimes. See *Commonwealth v. Hoag*, 665 A.2d 1212, 1214 (pa. Super. Ct. 1995). Like the defendant in *Commonwealth v. Johnson-Daniels*, 167 A.3d 17, 29 (Pa. Super. Ct. 2017), Defendant, in raising this claim, seems not to appreciate the harm his drug dealing has inflicted upon his community, or the danger that he poses to it. There will be no discount from this Court. We departed from the guidelines and we sentenced consecutively for the numerous reasons we stated on the record and that we have recounted in this opinion.

34

The public must be protected from the very real danger posed by this Defendant being at liberty—he deals drugs that cause destruction at best and, potentially, worse. The community of York was already ravaged by drugs before Defendant's addition, but the gravity of his offenses cannot be overstated. Defendant has no rehabilitative potential. He showed no care for the safety of his customers or those in his employ. And he has not become any less dangerous or less prone to drug-dealing as he has aged. Consecutive sentences were warranted—no matter the period of time over which the crimes were committed.

### D. Hearsay Objection

Defendant's final motion requests a new trial premised upon the assertion that this Court erred in admitting hearsay testimony over a defense objection. For the following reasons, we decline to do so.

While on the stand and prior to any objection, Kayleigh Jo Hess testified that on two or three occasions Defendant took her to New York, because Defendant needed someone to test drugs for him. (N.T., 9/14/20, at 253-254.) On one of those trips, Defendant and Ms. Hess picked up a black male in Baltimore. *Id.*, at 255. Ms. Hess was privy to conversations between that unidentified black male and Defendant during that trip. *Id.*, at 256. At this point in the testimony, defense counsel objected. *Id.* Commonwealth responded by invoking hearsay exceptions for statements made by party opponents as well as co-conspirators. *Id.* This Court overruled the objection and then Ms. Hess testified that Defendant and the

unidentified male spoke in code that she interpreted as them discussing what they were going to purchase. *Id.*, at 256-57.

Relevant portions of Pa.R.E. 803 (25) states the following:

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:

> **(25)** An Opposing Party's Statement. The statement is offered against an opposing party and:
>
> > **(A)** was made by the party in an individual or representative capacity;
> >
> > **(E)** was made by the Party's coconspirator during and in furtherance of the conspiracy.

In regards to Pa.R.E. 803(25)(A), the Commonwealth proffers the case of *Commonwealth v. Edwards*, 903 A.2d 1139, 1157 (Pa. 2006). Commonwealth's Memorandum of Law in Opposition to Defendant's Post-Sentence Motion/Motion to Reconsider Sentence, at 13. In *Edwards*, the Court related the following quote:

> It is fair in an adversary system that a party's prior statements be used against him if they are inconsistent with his position at trial. In addition, a party can hardly complain of his inability to cross-examine himself. A party can put himself on the stand and explain or contradict his former statements.

903 A.2d, at 1157 (quoting *Commonwealth v. Chmiel*, 738 A.2d 406, 420 (Pa. 1999), *cert. denied*, 528 U.S. 1131 (2000) (citing Packel & Poulin, Pennsylvania Evidence § 805 (1987)). The Court went on to state, "in criminal cases, this Court has consistently held that a defendant's out-of-court statements are party admissions and are exceptions to the hearsay rule." *Id.*, at 1157-1158 (additional citations omitted). Defendant's out-of-court coded speech

36

was admissible against him because it related to his drug-buying trip to New York, which was inconsistent with his position at trial.

In regards to Pa.R.E. 803(25)(E), the Superior Court has stated the following:

To lay a foundation for the co-conspirator exception to the hearsay rule, the Commonwealth must prove that: (1) a conspiracy existed between declarant and the person against whom the evidence is offered and (2) the statement sought to be admitted was made during the course of the conspiracy. In addition, there must be evidence other than the statement of the co-conspirator to prove that a conspiracy existed. *Commonwealth v. Basile*, 458 A.2d 587 (Pa. Super. Ct. 1983).

The order of proof is within the discretion of the lower court, which may, upon only slight evidence of the conspiracy, admit such statements subject to later proof of the conspiracy. *Commonwealth v. Plusquellic*, 499 A.2d 47 (Pa. Super. Ct. 1982).

482 A.2d 600, 604 (Pa. Super. Ct. 1984). Thus, for the unidentified male's coded statement, interpreted by a co-conspirator as being about purchasing drugs, to be admissible against Defendant, the Commonwealth needed to first prove the existence of a conspiracy between the unidentified male and Defendant.

Prior to admission of the statement, Ms. Hess had testified that she and the Defendant, during one of their drug-buying trips, drove to Baltimore to pick up the unidentified male. Baltimore is in the opposite direction of New York, as everyone knows, which amounts to more than just slight evidence of a conspiracy between Defendant and the unidentified male. After all, if Hess is to be believed, the unidentified male accompanied Defendant and Ms. Hess on a trip to buy drugs.

As for other evidence of a conspiracy, aside from the objected-to statement, the

37

Commonwealth supplied the testimony of Kayleigh Jo Hess. As just discussed, the detour to pick up the unidentified male to be present during a drug-buying trip is sufficient evidence of the conspiracy—separate from the hearsay statement.

Finally, the unidentified male's coded language about buying was made during the course of the conspiracy. Ms. Hess testified that the statement was made during the trip to New York, which means that the statement was made during the course of the conspiracy.

The Commonwealth laid a proper foundation to admit the unidentified male's hearsay coded language about buying drugs. Returning to Pa.R.E. 803(25)(A), the statement in question was made by Defendant's coconspirator, the unidentified male. Finally, the statement was made in furtherance of the conspiracy, as Ms. Hess understood the coded language to relate to purchasing drugs.

The unidentified male coconspirator's hearsay statement was properly admitted. This Court did not err in admitting it. Defendant's motion for a new trial premised upon this supposed error is denied.

## III.   Conclusion

For the foregoing reasons, Defendant's post-sentence motions are denied. Pursuant to Pa.R.Crim.P. 720(A)(2)(a), Defendant has 30 days from the entry of the order deciding his post-sentence motions to, if he so chooses, enter notice of appeal.

**BY THE COURT,**

DATED: April 16, 2020            **CRAIG T. TREBILCOCK, JUDGE**

39